PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PAT WEBSTER; JOEM WEBSTER;
ELIZABETH WEBSTER; CHARLES
FOLTZ; LINDA FOLTZ; GLORIA FOLTZ
WALKER; ELIZABETH WEBSTER, as
Executrix for the Estate of Allaina
Garrett Whetzel,

*Plaintiffs-Appellants,*

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, by and through its
Agency, the Natural Resources
Conservation Service; POTOMAC
VALLEY CONSERVATION DISTRICT;
HARDY COUNTY COMMISSION; WEST
VIRGINIA STATE CONSERVATION
AGENCY,

*Defendants-Appellees.*

No. 11-1739

Appeal from the United States District Court
for the Northern District of West Virginia, at Elkins.
John Preston Bailey, Chief District Judge.
(2:09-cv-00138-JPB)

Argued: May 16, 2012

Decided: July 13, 2012

Before WILKINSON, GREGORY, and FLOYD,
Circuit Judges.

Affirmed by published opinion. Judge Floyd wrote the opinion, in which Judge Wilkinson and Judge Gregory joined.

---

**COUNSEL**

**ARGUED:** Christopher Patrick Stroech, Shepherdstown, West Virginia, for Appellants. Mark R. Haag, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Silas B. Taylor, OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL, Charleston, West Virginia, for Appellee West Virginia State Conservation Agency; Jessica M. Baker, WALTERS, KRAUSKOPF & BAKER, Moorefield, West Virginia, for Appellees Potomac Valley Conservation District and Hardy County Commission; Ignacia S. Moreno, Assistant Attorney General, Elizabeth Ann Peterson, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States Department of Agriculture.

---

**OPINION**

FLOYD, Circuit Judge:

Over thirty-five years ago, the Natural Resources Conservation Service (NRCS),[1] working with local sponsors, devised a project to provide watershed protection, flood prevention, and recreation along the Lost River Subwatershed. The proposed project involved a combination of land-treatment measures and five dams and impoundments. In 1974, the NRCS

---

[1]The NRCS is an agency of the United States Department of Agriculture (USDA). Its predecessor agency until 1994 was the Soil Conservation Service. *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 260 n.1 (4th Cir. 2006). For ease of reference, we consistently refer to the agency as the "NRCS."

issued an environmental impact statement relating to the project, and since that time, three dams and most of the land-treatment measures have been completed. After preparing a supplemental environmental impact statement in 2009, the NRCS issued a record of decision that eliminated one of the remaining dams from the project and authorized construction of the final dam for the added purpose of providing water supply. Appellants, seven individuals who allege that their land will be adversely affected by this final dam's construction, filed this action contending that the NRCS has failed to comply with the National Environmental Policy Act (NEPA). They now appeal the district court's order granting Appellees' motion for summary judgment. Because we determine that the NRCS has complied with the procedures mandated by the NEPA and taken a hard look at the project's environmental effects, we affirm.

## I.

### A.

The "NEPA is a procedural statute" that "sets forth a regulatory scheme for major federal actions that may significantly affect the natural environment." *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 184 (4th Cir. 2005). Its procedural mandates serve dual purposes. *Id.* They ensure that an agency planning a major federal action obtains and considers the necessary information concerning any significant environmental impacts that the action may cause. *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002). They also guarantee that the public has access to the relevant information about the proposed action so that it can participate in the decisionmaking process. *Id.*

Under the NEPA, every "federal agency contemplating a major action" must formulate an environmental impact statement (EIS) if the action could significantly affect the environment. *Robertson v. Methow Valley Citizens Council*, 490 U.S.

332, 349 (1989); *see also* 42 U.S.C. § 4332(C). An EIS must contain certain information specified by federal statute and regulations promulgated by the Council of Environmental Quality (CEQ), a governmental body created by the NEPA. *Nat'l Audubon Soc'y*, 422 F.3d at 184-85; *Hodges*, 300 F.3d at 438. This information includes "the environmental effects and impacts of the proposed action, reasonable alternatives to it, possible mitigation measures for any negative environmental impacts that will result from it, and the cumulative impacts of it combined with other past, present, or foreseeable future actions." *Nat'l Audubon Soc'y*, 422 F.3d at 185 (citations omitted).

When preparing an EIS, an agency must follow procedures established by the CEQ. *Id.* These procedures require that an agency draft an EIS in stages. *Id.* The process begins with the agency publishing in the Federal Register a notice of intent to prepare and consider an EIS. 40 C.F.R. §§ 1501.7, 1508.22. Then the agency must engage in a "scoping" process designed to determine the scope of the issues to be addressed in the EIS and to identify significant issues related to the proposed action. *Id.* § 1501.7. During the scoping process, the agency must, among other things, invite participation and input by federal, state, and local agencies, as well as the public. *Id.*; *see also Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1022 (10th Cir. 2002). Utilizing information acquired during the scoping process, the agency is then to prepare an initial draft EIS, which it must make publicly available and circulate to other agencies for feedback. 40 C.F.R. §§ 1502.9(a), 1503.1. After doing so, the agency must draft a final EIS that addresses any comments. *Id.* §§ 1502.9(b), 1503.4.

Under certain circumstances, after the issuance of a final EIS, the agency may draw up a supplemental EIS. It may prepare a supplemental EIS if it determines that doing so would further the purposes of the NEPA. *Id.* § 1502.9(c)(2). A supplemental EIS becomes mandatory if the agency "makes sub-

stantial changes in the proposed action that are relevant to environmental concerns" or if "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" arise. *Id.* § 1502.9(c)(1). The agency must prepare, circulate, and file a supplemental EIS in the same manner as draft and final EISs, except, in general, it need not undertake a scoping process. *Id.* § 1502.9(c)(4). But if the agency makes substantial changes to the proposed action or significant new circumstances or information bearing on the proposal or its impacts arise, the agency must revise the determinations reached in the initial scoping process. *Id.* § 1501.7(c).

Finally, after the agency makes a decision regarding the action, it must publish a record of decision, at which point it may then finalize its action. *Nat'l Audubon Soc'y*, 422 F.3d at 185. As a purely procedural statute, the NEPA "does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350. In that sense, "it does not force an agency to reach substantive, environment-friendly outcomes," meaning that as long as the agency adequately considers a proposed project's adverse environmental effects, it may choose to pursue the project if it decides that the benefits outweigh them. *Nat'l Audubon Soc'y*, 422 F.3d at 184. Simply put, the "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351.

With this regulatory framework in mind, we now address the underlying events giving rise to this appeal.

B.

In December 1944, Congress enacted the Flood Control Act of 1944, ch. 665, 58 Stat. 887, authorizing "the construction and operation of certain dam and reservoir projects." *Cent. Elec. Power Coop., Inc. v. Se. Power Admin.*, 338 F.3d 333, 335 (4th Cir. 2003). Among the authorized projects were

"works of improvement for run-off and waterflow retardation, and soil-erosion prevention" for various specified watersheds, including the Potomac River Watershed. 58 Stat. at 905-06. The dispute here involves a project on the Lost River Sub-watershed, a part of the Potomac River Watershed situated in Hardy County, West Virginia.

Pursuant to this grant of authority, the NRCS, upon application by local sponsoring organizations,[2] developed the "Lost River Subwatershed Project" (Project). In October 1974, after circulating a draft for comment, the NRCS issued a final EIS (1974 EIS) related to the Project. In it, the NRCS observed that the Lost River Subwatershed was incurring damage from erosion, sedimentation, and frequent floods. It also recognized the need for more recreational opportunities in the area. The NRCS thus identified three overarching purposes underlying the Project: watershed protection, flood prevention, and recreation.

Additionally, in the 1974 EIS, the NRCS analyzed six alternatives, including the alternative of no action, before settling on a plan that involved applying land-treatment measures to 94,750 acres and constructing five dams and impoundments on designated sites. Four of the dams, located on Sites 4, 10, 23, and 27, were to be single-purpose flood-retarding structures. The fifth dam, located on Site 16, was to be a multiple-purpose floodwater storage and recreation structure. The NRCS described the Project's anticipated environmental impacts and recognized that it would require relocating eleven residences. The NRCS also considered and responded to comments received by various governmental agencies.

---

[2]Originally, the local project sponsors consisted of the County Court of Hardy County and the Potomac Valley Conservation District (PVCD). As the Project progressed, the Hardy County Commission (HCC) replaced the County Court as a sponsor. The West Virginia State Conservation Committee, which is the governing board of directors of the West Virginia State Conservation Agency (WVSCA), also later joined.

Also in October 1974, the NRCS and the local project sponsors released a work plan for implementing the Project. They discovered, however, that local support for the Project was lacking, prompting them to suspend its implementation. In 1977, the NRCS noted in a letter that revival of the Project would primarily depend on a decision by the local sponsors to proceed. After serious flooding in 1985 caused damage along the Lost River, the project sponsors requested that the NRCS resume implementation of the Project, so it did.

In August 1989, the NRCS issued an environmental assessment (1989 EA), which is a document that an agency prepares to assist its planning and decisionmaking or to determine whether an EIS is necessary, 40 C.F.R. §§ 1501.3, 1501.4(c). In the 1989 EA, the NRCS reevaluated potential environmental impacts relating to Site 4, the first dam scheduled for construction. A little over a year later, the NRCS drafted a "Supplemental Information Report" analyzing whether there had been any significant changes to the Project as a whole or whether any significant environmental changes had occurred since issuance of the 1974 EIS. It concluded that there had been no such changes and determined that the 1974 EIS still adequately described the Project and its impacts. Nevertheless, in this report, the NRCS addressed some insignificant environmental changes and changes with respect to the costs, benefits, and opportunities for incidental recreation.

The NRCS issued a record of decision in January 1991 approving implementation of the Project. A federal lawsuit was then brought challenging the Project and the planned construction of the dam at Site 4, but the parties ultimately agreed to dismiss the claims involving Site 4 with prejudice and the claims challenging the remainder of the sites without prejudice. In May 1994, as Site 4's dam was under construction, the NRCS issued an environmental information report relating to the next dam scheduled for construction, the Site 27 dam. By 2001, construction of the dams on Sites 4 and 27 was

complete, and land-treatment measures had been applied to 16,740 acres in accordance with the Project.

The NRCS then turned its attention to construction of the dam at Site 10. In 2001, it issued an environmental assessment report (2001 EA) primarily addressing this dam's planned construction. The NRCS discussed a recent drought in the area that prompted the local sponsors to request that it add water supply as a purpose for the Site 10 dam. It evaluated the need for this additional purpose and the resultant effects of such a change. The NRCS considered three alternatives involving the use of surface water, groundwater, and water purchase agreements before concluding that adding water supply storage to the dam at Site 10 was the only practicable alternative for providing both water supply and flood prevention.

The Hardy County Public Service District (HCPSD), though not a local sponsor of the Project, began planning the construction of the "Baker/Mathias Water Distribution System" as early as October 2003, when it released a preliminary engineering report. The purpose of the system, which the USDA agreed to fund partially, was to supply water to the central region of Hardy County. To do so, it would utilize the water supply source from the dam at Site 10. Although construction of Site 10's dam was complete by 2005, as of 2009, construction of the water distribution and treatment system remained pending.

Meanwhile, the NRCS and the local project sponsors continued to evaluate Hardy County's water resources. In April 2004, the NRCS and the WVSCA prepared a report entitled "Hardy County Water Resources Assessment," which evaluated the existing and projected water needs for Hardy County. Also, in March 2007, the local project sponsors, with assistance from the NRCS, issued a report entitled "Projected Water Needs in Hardy County." This report concluded that

adding water supply storages to the dams at Sites 10 and 16 was necessary to meet the projected short-term water demand.

In 2005 the local project sponsors requested that the NRCS add water supply and remove recreation as purposes for Site 16's dam. That same year, the NRCS issued a report reevaluating Site 23 and proposing its elimination. The changes to the Site 16 dam's purposes and the proposed elimination of Site 23 required the NRCS to prepare a supplemental EIS, so in 2006 the NRCS published a notice of intent to prepare such a statement and engaged in a scoping process. In April 2007, after circulating a draft for comment, the NRCS published a final supplemental EIS (2007 SEIS). The 2007 SEIS reflected changes in the purposes of the Site 16 dam to include flood control, water supply, and watershed protection, but not recreation. Approximately two months later, the NRCS issued a record of decision; however, the NRCS withdrew it almost two years later after the filing of a federal lawsuit challenging it. According to the NRCS, additional analyses and investigations involving Site 16 had become available, and it wanted to incorporate them into its supplemental EIS. The district court thereafter dismissed the federal lawsuit pursuant to the parties' stipulation.

In March 2009, the NRCS published a notice of intent to update and reissue a second draft supplemental EIS. It did not, however, engage in another scoping process. After distributing a draft for comment, the NRCS issued a second final supplemental EIS in August 2009 (2009 SEIS). In it, the NRCS eliminated Site 23 from the Project and added water supply as a purpose for the dam at Site 16. Although it removed recreation as a purpose, it recognized that Site 16 would still offer incidental recreational opportunities. As in the 2007 SEIS, the purposes of Site 16's dam were watershed protection, flood prevention, and water supply. The NRCS considered seventeen alternatives for achieving these purposes, but analyzed only two in detail, the no-action alternative and construction of the dam at Site 16. After considering the relative impacts

of these two alternatives, including cumulative impacts, the NRCS recommended constructing the dam at Site 16 and described measures for mitigating its adverse impacts. In October 2009, the NRCS issued a second record of decision agreeing to implement the Project for Site 16.

C.

On November 23, 2009, Appellants filed a complaint in the Northern District of West Virginia. Named as defendants were the USDA, NRCS, PVCD, HCC, and WVSCA (collectively, Appellees). Appellants challenged Appellees' decision to construct the dam at Site 16 and contended that they had failed to comply with the NEPA. All Appellants asserted that construction of the dam would not only affect their land, but would cause them to lose at least some, if not all, of it. After alleging numerous violations of the NEPA, primarily relating to purported deficiencies in the 2009 SEIS, Appellants requested declaratory and injunctive relief, costs, expenses, and attorneys' fees.

In early 2011, the parties filed cross-motions for summary judgment. On June 13, 2011, the district court issued an order granting Appellees' motion for summary judgment and denying Appellants'. It addressed each alleged NEPA violation before concluding that Appellees complied with the NEPA by abiding by its procedural requirements, taking a hard look at the environmental consequences that would result from construction of the dam at Site 16, and allowing for public participation in the decisionmaking process. Appellants brought this timely appeal.

II.

We review de novo the district court's order granting summary judgment. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn there-

from in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

In reviewing an agency's efforts to comply with the NEPA, our task is to ensure that it took a "hard look" at the environmental consequences of the proposed action. *Nat'l Audubon Soc'y*, 422 F.3d at 185. This review "requires a pragmatic judgment whether the [EIS's] form, content[,] and preparation foster both informed decision-making and informed public participation." *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1036 (9th Cir. 2012) (quoting *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010)) (internal quotation marks omitted). A hard look involves, at minimum, "a thorough investigation into the environmental impacts of [the] action and a candid acknowledgement of the risks that those impacts entail." *Nat'l Audubon Soc'y*, 422 F.3d at 185. In conducting this review, we "may not 'flyspeck' [the] agency's environmental analysis, looking for any deficiency, no matter how minor." *Id.* at 186. Instead, we "must take a holistic view of what the agency has done to assess environmental impact" and "examine all of the various components of [the] agency's environmental analysis . . . to determine, on the whole, whether the agency has conducted the required 'hard look.'" *Id.*

Moreover, because the Administrative Procedure Act (APA) governs our review of claims brought under the NEPA, we may set aside the agency's action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 601 (4th Cir. 2012) (quoting 5 U.S.C. § 706(2)(A)) (internal quotation marks omitted). This involves a searching and careful, but ultimately narrow and highly deferential, inquiry. *Id.*; *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). In the end, "[i]f the agency has followed the proper procedures, and

if there is a rational basis for its decision, we will not disturb its judgment." *Hodges*, 300 F.3d at 445.

### III.

On appeal, Appellants raise essentially eight issues, which we address in turn.

### A.

Appellants first contend that the NRCS failed to comply with the NEPA in arriving at watershed protection, flood prevention, and water supply as its stated purposes and needs for constructing the dam at Site 16. They maintain that the NRCS blindly accepted the purposes and needs provided by the local project sponsors without conducting an independent, objective inquiry. Appellants also challenge as inadequate the evidence relied upon by the NRCS in justifying these purposes and needs. As a result, they insist that the NRCS's stated purposes and needs for the dam at Site 16 are unreasonable.

An EIS must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. Only alternatives that accomplish the purposes of the proposed action are considered reasonable, and only reasonable alternatives require detailed study. *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011). So how the agency defines the purpose of the proposed action sets the contours for its exploration of available alternatives. *See id.*

Agencies enjoy considerable discretion in defining the purposes and needs for their proposed actions, provided that they are reasonable. *See, e.g.*, *id.* at 1244-45; *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1070; *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). Typically, a purpose is unreasonable when the agency defines it so narrowly as to allow "only one alternative from among

the environmentally benign ones in the agency's power," such that the EIS becomes essentially "a foreordained formality." *Citizens Against Burlington*, 938 F.2d at 196. Conceivably, a purpose can also be unreasonable if the agency draws it so broadly that "an infinite number of alternatives would accomplish [it] and the project would collapse under the weight of the possibilities." *Id.* But the potential for an agency to define a purpose that broadly appears remote, for agencies have a disincentive that assumedly would discourage them from doing so: whereas drawing a purpose too narrowly is attractive because it eases the agency's burden in drafting an EIS by reducing the number of alternatives that it must explore in detail, drawing a purpose too broadly complicates an agency's drafting of an EIS by expanding the number of alternatives it must examine to a point that would make its task unmanageable.

In deciding on the purposes and needs for a project, it is entirely appropriate for an agency to consider the applicant's needs and goals. *See id.* Appellants, in arguing that the NRCS inappropriately relied upon the local project sponsors' purposes and needs, seek support from the Seventh Circuit's decision in *Simmons v. United States Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997), where it stated that agencies have a "duty under [the] NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project." *Id.* at 669 (quoting *Citizens Against Burlington*, 938 F.2d at 209 (Buckley, J., dissenting in part)) (internal quotation marks omitted). This decision, however, is of no assistance to Appellants. Contrary to their assertions, the NRCS conducted a searching, independent review of the stated purposes and needs for Site 16's dam, which demonstrates that it exercised a degree of skepticism in establishing them.

In explaining why watershed protection and flood prevention were necessary purposes and needs in the 2009 SEIS, the NRCS incorporated by reference, among other things, the

1974 EIS and work plan, which explained in detail the flood-water, sediment, and erosion problems justifying the Project. Furthermore, the 2009 SEIS reaffirmed the continued need for measures to curb problems relating to flooding, noted the almost decennial occurrence of damaging floods in the area, and provided various maps and other investigative analyses in support. Even if the NRCS did not provide precisely the information that Appellants desire, it set forth enough of a well-documented discussion to demonstrate that it had a reasonable basis for deciding that watershed protection and flood prevention were appropriate purposes and needs for Site 16's dam. This discussion and its accompanying information reveal that the NRCS carefully considered including watershed protection and flood prevention as purposes and needs for the dam at Site 16.

Moreover, in the 2009 SEIS, the NRCS noted the local project sponsors' request to add water supply as a purpose and need for the dam at Site 16, and the sponsors' explanation of why this addition was appropriate in light of population and development trends and projections in the area. In recognizing these trends and projections, the NRCS discussed the 2004 and 2007 reports on water resources in Hardy County, both of which it assisted in preparing. Collectively, these reports suggested that additional water supplies in the area were necessary and that water storage in the dams at Sites 10 and 16 was required to meet short-term demand. Although Appellants charge that these reports have not been updated and are likely overstated, they provide nothing beyond speculation that would call into question their findings. Based on the NRCS's discussion concerning the need for water supply and the supporting reports, we are confident that it adequately scrutinized whether adding water supply as a purpose and need was appropriate.

On the whole, it is evident that although the NRCS considered the local project sponsors' goals and needs, as was appropriate, it nevertheless conducted its own searching

inquiry into the purposes and needs for the Site 16 dam. It then framed the purposes and needs in a manner that was neither so narrow as to yield only one suitable alternative nor so broad as to produce an overwhelming and unmanageable number of alternatives. And, importantly, the NRCS's purposes and needs for the dam at Site 16 are consistent with Congress's authorization in the Flood Control Act. *See Citizens Against Burlington*, 938 F.2d at 196 (recognizing that when arriving at the purposes and needs for a proposed action agencies must consider their statutory authorization to act). In the end, therefore, the NRCS's decision to include watershed protection, flood prevention, and water supply as the purposes and needs underlying Site 16's dam was an appropriate exercise of its discretion.

### B.

Appellants next insist that the NRCS violated the NEPA by failing to engage in a scoping process before issuing the 2009 SEIS. As noted, the goal of the scoping process is to "identify[ ] specific issues to be addressed and studied" by "solicit[ing] comments and input from the public and other state and federal agencies." *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1022. Agencies, however, are not required to engage in a scoping process when devising a supplemental EIS, *see* 40 C.F.R. § 1502.9(c)(4), but they may have to revise determinations made in an initial scoping process if they subsequently make substantial changes to the proposed action or if significant new circumstances or information bearing on the proposed action or its impacts arise, *see id.* § 1501.7(c).

Appellants acknowledge this general rule. Their retort, however, is that the 2009 SEIS did not supplement the 2007 SEIS but instead replaced it. Although they fail to elaborate further, we presume their argument to be that even though the NRCS undertook a scoping process prior to the 2007 SEIS, it needed to undertake one leading up to the 2009 SEIS because the 2009 SEIS replaced the 2007 SEIS. We disagree.

When it prepared the 2009 SEIS, the NRCS justifiably relied on the scoping determinations made leading to the 2007 SEIS. That the NRCS decided to withdraw its record of decision related to the 2007 SEIS and issue the 2009 SEIS does not operate to nullify the scoping process it had previously undertaken. Like the 2007 SEIS before it, the 2009 SEIS supplemented the 1974 EIS in light of the elimination of Site 23 and the addition of water supply as a purpose for the dam at Site 16. As the NRCS acknowledged, the nature and extent of the action did not change between the 2007 SEIS and the 2009 SEIS. Moreover, Appellants do not highlight any significant new circumstances or information that arose during that time and would require revising the previous scoping determinations. The specific issues that the NRCS needed to study remained the same. Simply put, nothing occurred after the scoping process leading to the 2007 SEIS that required the NRCS to revisit the scoping determinations when it prepared the 2009 SEIS.

In the absence of any such changes or new information or circumstances, requiring the NRCS to undertake another scoping process for the 2009 SEIS would exact needless costs and delay. The NEPA imposes procedural mandates for the purpose of ensuring informed decisionmaking and public participation, not to impose red tape for its own sake. Requiring the NRCS to engage in a new scoping process prior to preparing the 2009 SEIS would achieve the latter consequence but not the former purpose. We are therefore of the opinion that the NRCS was not required to engage in another scoping process when preparing the 2009 SEIS.

## C.

Appellants' third contention is that the 2009 SEIS omits information that is necessary for a complete analysis of the Site 16 dam's potential environmental impacts and stated benefits. They specify a variety of missing information, mostly pertaining to details about the construction or operation of the

dam at Site 16. They also maintain the NRCS failed to consider connected actions in the 2009 SEIS—specifically, the construction and operation of a water treatment facility and water distribution system.[3]

### 1.

At the outset, we reiterate that we may not seize upon trivial inadequacies to reject the agency's decision, for that would impermissibly intrude into its decisionmaking prerogative. *Nat'l Audubon Soc'y*, 422 F.3d at 186. Put another way, "[d]eficiencies in an EIS that are mere 'flyspecks' and do not defeat [the] NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal." *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009).

Also, in assessing a claim that an agency has omitted information in an EIS, we must further keep in mind that agencies are charged with "concentrat[ing] on the issues that are truly significant to the action in question, rather than amassing needless detail." 40 C.F.R. § 1500.1(b); *see also id.* § 1502.2 ("[EISs] shall be analytic rather than encyclopedic."). That is in part because an EIS containing vast quantities of inconsequential information can actually defeat the NEPA's goals of informed decisionmaking and public participation by drowning out truly significant information with that which is insignificant. Agencies therefore face a delicate balancing act: they must include enough details about a proposed action to allow for the requisite hard look at its environmental effects without providing so much information that the EIS becomes self-

---

[3]We have framed this argument as we understand it. It is unclear to us whether Appellants believe that details regarding the construction and operation of Site 16's dam—such as the number of workers necessary for construction, the size and location of the site, and the type of construction equipment that will be used—also constitute connected actions. If so, we agree with the district court that these aspects concerning the construction and operation of Site 16's dam do not constitute connected actions.

defeating. Except when prescribed by statute or regulations, deciding what details need to be included or omitted in an EIS is generally a matter left to the agency's discretion, which we will not disturb unless we are convinced that its exercise prevented the agency from taking a hard look at the action's environmental effects or the public from participating in the decisionmaking process.

Turning to the information Appellants insist was missing, we note initially that the 2009 SEIS included at least some of it. For example, whereas Appellants contend that the 2009 SEIS omitted information regarding the excavation of borrow material for use in constructing the dam, it in fact discussed where the borrow areas would be and provided a map showing their locations. And, similarly, notwithstanding Appellants' assertion that the 2009 SEIS did not provide the size and location of the construction site, it actually did describe the size of the site and its location and provided a project map showing the same.

To the extent the 2009 SEIS did not include the other information specified by Appellants, we find the omissions to be inconsequential. The purportedly missing information includes such items as the "[n]umber of workers needed for construction," the "[l]ocation and distance of access roads," the "[l]ocation and distance of utility rights-of-ways," the "[t]ype of construction equipment that would be used and for how long," and the "[l]ocation and size of parking areas." Appellants simply list the types of missing information without any explanation as to their significance or how their omission impedes the NEPA's goals of informed decisionmaking and public participation. And the consequentiality of their omission is not readily apparent to us. Instead, they strike us as either needless detail that would clutter the 2009 SEIS or trivial deficiencies that invite flyspecking. In the end, the omission of this information does not disturb our belief that the NRCS took a hard look at the Site 16 dam's environmental effects and that the public had adequate information to par-

ticipate in the decisionmaking process. As a result, we will not second-guess the agency's decision to omit it.

2.

We also find unmeritorious Appellants' assertion that the NRCS violated the NEPA by failing to consider as connected actions the construction and operation of a water treatment facility and water distribution system.

Agencies must consider connected actions in the same EIS. 40 C.F.R. § 1508.25(a)(1). This requirement is intended to prevent agencies from engaging in segmentation, which involves "an attempt to circumvent [the] NEPA by breaking up one project into smaller projects and not studying the over-all impacts of the single overall project." *Coal. on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 311 (2d Cir. 2009) (quoting *Stewart Park & Reserve Coal., Inc. v. Slater*, 352 F.3d 545, 559 (2d Cir. 2003)) (internal quotation marks omit-ted). Connected actions include those that (1) "[a]utomatically trigger other actions which may require environmental impact statements"; (2) "[c]annot or will not proceed unless other actions are taken previously or simultaneously"; or (3) "[a]re interdependent parts of a larger action and depend on the larger action for their justification." § 1508.25(a)(1). Gener-ally, in determining whether actions are connected so as to require consideration in the same EIS, courts employ an "in-dependent utility" test, which asks whether each project would have taken place in the other's absence. *See, e.g.*, *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1087 (9th Cir. 2011); *Chu*, 592 F.3d at 312; *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1228-29 (10th Cir. 2008). If so, they have independent utility and are not considered connected actions. *N. Plains Res. Council*, 668 F.3d at 1087-88.

Appellants have failed to point to a water treatment facility or water distribution system connected to the construction of

the dam at Site 16. Although Appellants do not specifically argue that the HCPSD's planned development of the Baker/Mathias Water Distribution System is a connected action, we nevertheless underscore that it is independent of the NRCS's proposed action here. The NRCS emphasized when responding to comments in the 2009 SEIS that the HCPSD would implement its system regardless of whether the dam at Site 16 was constructed and, conversely, that the NRCS would add water supply to the dam at Site 16 even if the HCPSD abandoned its system. Given that the Baker/Mathias Water Distribution System is independent of the NRCS's construction of Site 16's dam, it is not a connected action.

Furthermore, Appellants have failed to demonstrate that any other water treatment facility or water distribution system has been planned, much less in connection with the dam at Site 16. Appellants apparently argue that because the Site 16 dam will include a water supply source, it will necessarily require such a facility and system in the future to service the source, so the NRCS should have considered them as connected actions. Appellees, however, insist that there are no plans for such a facility or system, and Appellants give us no reason to question this representation. In the absence of any impending plans to construct such a system or facility, segmentation is not a concern. *See Wilderness Workshop*, 531 F.3d at 1229; *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 236-37 (5th Cir. 2007). And, furthermore, we fail to see how the agency could consider a water treatment facility and water distribution system, much less their impacts, when there are no current plans to build them. Because such a project is speculative at best and any discussion of its impacts would be speculative, the agency was not required to discuss it as a connected action. *See Wyoming*, 661 F.3d at 1253 ("In general, we have not required agencies to consider 'speculative' impacts or actions in an EIS . . . .").

## D.

Appellants next maintain that the NRCS failed to consider all reasonable alternatives in its 2009 SEIS.

At the heart of an EIS is the required analysis of "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii); 40 C.F.R. § 1502.14. In this section, the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). For alternatives that are unreasonable, the agency need only briefly discuss its reasons for eliminating them from detailed study. *See id.* Hence, because alternatives that do not accomplish the purpose or objective of the action are unreasonable, they require only a brief explanation for their rejection. *Wyoming*, 661 F.3d at 1244. Also, the agency is not required "to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." *Id.* (omission in original) (quoting *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1030) (internal quotation marks omitted) The agency, however, must always consider "the alternative of no action." 40 C.F.R. § 1502.14(d).

We are confident that the NRCS considered all reasonable alternatives. Throughout the Project's history, from the 1974 EIS and the various supplements and reports that followed it to the 2009 SEIS, the NRCS studied numerous alternatives to its proposed action. In the 2009 SEIS specifically, the NRCS discussed seventeen alternatives. It offered appropriate reasons for eliminating all but two from detailed study, including, among other considerations, reasons related to technical feasibility, pecuniary costs, and effectiveness in achieving the purposes of the action. The NRCS then provided detailed examination of the no-action alternative and the alternative involving construction of the dam at Site 16. On its face, this discussion of alternatives complies with the mandates of the NEPA.

Appellants argue that the NRCS's analysis is nevertheless deficient because it failed to give detailed study to two general types of alternatives. First, they maintain that the NRCS should have afforded detailed consideration to alternatives involving multiple actions that separately could achieve the individual purposes underlying the dam at Site 16 . In fact, in the 2009 SEIS, the NRCS considered alternatives that would provide flood control and water supply separately, but eliminated them from detailed consideration for various appropriate reasons described above. Notably, Appellants fail to offer a specific alternative involving multiple actions that the NRCS should have considered in detail. Nor do they highlight a specific alternative that the NRCS eliminated from further consideration of which it should have provided detailed study. So we are left only to speculate that one might exist, which is an insufficient ground for disturbing the agency's decision. We therefore are unconvinced that the NRCS improperly eliminated from detailed consideration alternatives involving multiple actions that could achieve Site 16's dam's purposes individually.

Second, Appellants contend that the NRCS failed to consider alternatives involving other sites for the proposed dam within the Lost River Subwatershed. Instead, according to Appellants, the NRCS simply relied upon the 1974 EIS's consideration of thirty other locations, even though the purposes for the dam have changed. But that is inaccurate. In the 2009 SEIS, after noting that it examined thirty other locations leading up to the 1974 EIS, the NRCS asserted that as part of its supplemental evaluation it had reconsidered whether the Site 16 and Site 23 locations were still the most viable alternatives. It observed that its reevaluation prompted it to eliminate Site 23 as infeasible. With respect to the dam at Site 16, it determined that there were no new locations for impoundments that were viable and that would achieve the identified purposes and needs. Appellants do not offer a location that would call into question this determination, so we defer to it.

The NRCS thus was not required to give this alternative detailed consideration.

## E.

Appellants assert that in the 2009 SEIS the NRCS failed to address all of the environmental effects that would result from construction of the dam at Site 16.[4] In support, they list specific effects that they allege the NRCS neglected to consider. Relatedly, according to Appellants, the NRCS also did not conduct a sufficient cumulative-impacts analysis.

An EIS must include a discussion of "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(C)(i)-(ii). Because "[t]his section forms the scientific and analytic basis for the comparison[ ]" of alternatives, it must "include the environmental impacts of the alternatives[,] including the proposed action." 40 C.F.R. § 1502.16.

The CEQ has instructed agencies on the types of impacts or "effects" (the regulations treat these terms as synonymous) that they must consider: "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health." *Id.* § 1508.8. Agencies must

---

[4]In addressing this issue, Appellants begin by insisting that the 2009 SEIS is deficient because it incorporated and relied on information set forth in the 1974 EIS without indicating that the NRCS updated it or otherwise ensured its continued accuracy. But given that the CEQ's regulations encourage agencies to tier their analyses and incorporate such prior statements in subsequent statements by reference, *see* 40 C.F.R. § 1502.20, it was appropriate for the NRCS to rely on the 1974 EIS in its 2009 SEIS. Moreover, Appellants fail to highlight any inaccurate or outdated information upon which the NRCS relied. In the absence of evidence that the NRCS relied on inaccurate or outdated information from the 1974 EIS, we will not assume that it did.

study these effects whether they are direct, meaning that they "are caused by the action and occur at the same time and place," or indirect, which means that they "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* Additionally, agencies have to examine cumulative impacts resulting from "the incremental impact of the [proposed] action when added to other past, present, and reasonably foreseeable future actions." *Id.* § 1508.7. Yet although agencies must take into account effects that are reasonably foreseeable, they generally need not do so with effects that are merely speculative. *Wyoming*, 661 F.3d at 1253.

After reviewing the 2009 SEIS, we are convinced that the NRCS took a hard look at the environmental effects that construction of the dam at Site 16 would have. The 2009 SEIS provided detailed analyses of the dam's effects on the following: flood damage; public health and safety; water supply, including its economic implications; soil erosion and sedimentation; agricultural productivity; prime and unique farmland; land use and upland habitats; aquatic resources; recreation; riparian areas; wetlands; waters of the United States; water quality; threatened and endangered species; invasive species; historic, scientific, and cultural resources; and environmental justice. The NRCS examined the effects of each with relation to both the no-action alternative and the construction of the dam.

The 2009 SEIS also contained a cumulative-impacts analysis in which it discussed the environmental effects that construction of the dam at Site 16 would have in conjunction with the effects of five other projects in the area. Contrary to Appellants' assertion, the NRCS considered the overall cumulative impact of these projects with respect to various environmental effects, including, but not limited to, effects on forestland, farmland, wetlands, and habitats. In the end, we are satisfied that the NRCS performed a thorough investiga-

tion into the action's effects and candidly acknowledged its risks.

Our opinion that the NRCS took a hard look at the environmental effects of constructing the dam at Site 16 is undisturbed by the specific effects that Appellants contend the NRCS failed to discuss. It is again clear that the NRCS considered at least one of the sources of information that Appellants insist is missing—specifically, the impact that the dam would have on downstream fisheries. The NRCS, in its discussion of the Site 16 dam's effects on aquatic resources, candidly acknowledged that the dam "would result in a barrier to fish movement between the upper reaches of Lower Cove Run and the lower sections of this stream and the main stem [of the] Lost River."

Other effects that Appellants maintain are missing are either speculative or relatively inconsequential flyspecks. For instance, similar to their argument regarding connected actions, Appellants assert that the NRCS should have considered the effects resulting from the construction of a new water treatment facility and water distribution system to service the water supply source at Site 16's dam. But, as we explained, such a system has not been planned and is speculative, making any effects resulting from it speculative as well. After reviewing the remainder of Appellants' list of purportedly unaddressed effects and considering the 2009 SEIS's discussion of environmental effects holistically, we remain convinced that the NRCS took a hard look at the action's environmental effects.

F.

Appellants assert that the NRCS included a misleading and inaccurate cost-benefit analysis. They highlight the following as contributing to its misleading nature: 1) the NRCS admitted that the usual design life for watershed-protection and flood-prevention structures is fifty to one hundred years, but

in its cost-benefit analysis, it used a design life of one hundred years, the far end of the spectrum; 2) the NRCS's cost-benefit ratio compared the costs and benefits of the Project as a whole, not Site 16 specifically, which, according to Appellants, may mask a less desirable cost-benefit ratio for Site 16 alone; and 3) the NRCS included as benefits over $900,000 that would result from incidental recreation, even though it eliminated recreation as a purpose.

We have emphasized before that an agency must weigh a proposed action's benefits with its environmental costs. *See Ohio Valley Envtl. Coal.*, 556 F.3d at 191 ("[E]ven agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs."); *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1999) ("NEPA requires agencies to balance a project's economic benefits against that project's environmental effects."). The CEQ's regulations require that an EIS "at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision." 40 C.F.R. § 1502.23. Along these lines, an EIS should provide enough detail concerning the drawbacks and merits of the proposed action to allow for reasoned evaluation and decisionmaking. *See Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186, 191 n.8 (7th Cir. 1986).

But an agency need not include a cost-benefit analysis in an EIS when comparing the different alternatives. *See* § 1502.23. That said, if an agency considers "a cost-benefit analysis relevant to the choice among environmentally different alternatives," it must either append it to the EIS or incorporate it by reference. *Id.* The agency does not, however, need to display the weighing of the merits and drawbacks of the alternatives in a monetary cost-benefit analysis. *Id.* And indeed it would be improper to do so "when there are important qualitative considerations." *Id.*

In any event, an EIS may be deficient if its assessment of the costs and benefits of a proposed action relies upon "misleading economic assumptions." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446 (4th Cir. 1996). Misleading economic assumptions can prevent the agency from engaging in informed decisionmaking when balancing the proposed action's benefits with its environmental effects. *Id.* They can also preclude meaningful public participation "by skewing the public's evaluation of" the action. *Id.* We remain cognizant, however, that the weighing of a project's benefits with its costs lies at the core of an agency's discretion, so we perform "a 'narrowly focused' review of the economic assumptions underlying a project to determine whether [they] 'were so distorted as to impair fair consideration' of the project's adverse environmental effects." *Id.* (quoting *S. La. Envtl. Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir. 1980)).

Here, the NRCS included a comparison of the monetary and qualitative costs and benefits of the two alternatives it analyzed in detail—the dam at Site 16 and the no-action alternative. Contrary to Appellants' assertions, the analysis is not misleading and does not thwart the NEPA's goals of informed decisionmaking and public participation. First, there is nothing misleading or problematic about the fact that the NRCS used a project life of one hundred years for Site 16's dam, particularly when that period is within the usual range for such projects, even if it as at the high end of the normal range. Using a project life of one hundred years was a reasonable exercise of the agency's discretion.

Second, there is no danger that the NRCS sought to mask the relative costs and benefits of Site 16 alone by focusing on the Project as a whole. Incorporated in the 2009 SEIS was a chart comparing the costs and benefits of the Project if Site 16's dam is constructed with the costs and benefits of the Project if Site 16's dam is not constructed. It includes a comparison of both monetary and nonmonetary benefits and costs.

This comparison brings into relief the relative costs and benefits specific to Site 16. Regardless of whether the cost-benefit ratio focused on the Project as a whole, it is evident that the NRCS considered the costs and benefits of Site 16 specifically, and that the public had the information to do the same.

Finally, it was not misleading for the NRCS to include incidental recreational benefits after removing recreation as a purpose. The 2009 SEIS explained that, although recreation was no longer a purpose for the dam at Site 16, incidental recreation, such as fishing, bird watching, boating, and hiking, would still occur. The estimated benefits reflected this incidental recreation, and nothing suggests that this amount is inflated or otherwise erroneous.

G.

Appellants contend that the 2009 SEIS failed to provide sufficient detail about planned mitigation measures so that they could be fairly evaluated. According to Appellants, the 2009 SEIS includes only unspecified measures. As proof, they point to the NRCS's response to a comment in the 2009 SEIS in which it stated that in the future, to obtain the necessary Clean Water Act Section 404 permit from the Army Corps of Engineers and Section 401 state water quality certification, it would develop a compensatory mitigation plan further addressing wetlands impacts.

An "important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." *Robertson*, 490 U.S. at 351. The statutory mandate that agencies detail "any adverse environmental effects which cannot be avoided should the proposal be implemented," 42 U.S.C. § 4332(C)(ii), implicitly assumes "that the EIS will discuss the extent to which adverse effects can be avoided," *Robertson*, 490 U.S. at 352. The CEQ's regulations impose such a requirement more explicitly. In scattered provisions, they instruct agencies to "discuss possible mitigation

measures in defining the scope of the EIS, in discussing alternatives to the proposed action and consequences of that action, and in explaining its ultimate decision." *Id.* (citations omitted) (citing 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1505.2(c), 1508.25(b)).

To satisfy these procedural mandates, an EIS must contain a "reasonably complete discussion of possible mitigation measures," which requires an examination of mitigation measures "in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Id.* This ordinarily obligates agencies to do more than simply list possible mitigation measures. *San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1053-54 (10th Cir. 2011). But there is no "substantive requirement that a complete mitigation plan be actually formulated and adopted." *Robertson*, 490 U.S. at 352. The inquiry into the level of specificity required to provide a reasonably complete mitigation discussion is necessarily contextual. *See Stiles*, 654 F.3d at 1054. An EIS for a "large-scale, multi-step project" will generally demand less detail than an EIS for a "relatively contained, site-specific proposal." *Id.*

As a statement pertaining to a site-specific proposal, the 2009 SEIS contained a reasonably complete discussion of possible mitigation measures. It did not simply list possible measures. Instead, after describing the dam at Site 16 as the recommended alternative for achieving its purposes, the NRCS provided a "Mitigation Summary" in which it first identified environmental effects that construction of the dam at Site 16 would have and then explained measures it would take to mitigate each effect. Notwithstanding Appellants claim to the contrary, these measures, by and large, introduced specific proposals to alleviate specific effects. An example involves the NRCS's discussion of measures it would take to mitigate the action's effects on wetlands. The NRCS provided a map with wetland areas marked on it and, using that map, described how it would attempt to avoid cer-

tain marked areas. It also described planned efforts to create new wetlands in specified locations.

Moreover, the Mitigation Summary was not the only section of the 2009 SEIS that discussed mitigation measures. When explaining the environmental effects of the alternatives, the 2009 SEIS described specific mitigation measures the NRCS would take to alleviate the Site 16 dam's effects. For instance, after reporting how the permanent lake created by the dam at Site 16 could cause increased water temperatures, it stated that "[t]o avoid adverse temperature impacts to the fishery downstream of Site 16, a cold water release in the principal spillway structure will be included with the riser configuration." Such discussions of specific, detailed mitigation measures that are responsive to specified effects reinforce our belief that the NRCS fairly evaluated the action's environmental consequences.

The NRCS's allusion to the fact that to obtain required permits it would have to develop a compensatory mitigation plan related to wetlands effects does not dissuade us of this belief. Again, there is no requirement that the agency formulate and adopt a complete mitigation plan at this stage. *See Robertson*, 490 U.S. at 352-53. That the NRCS may have to develop further mitigation measures in the future to comply with permit requirements does not render its current mitigation discussion insufficient under the NEPA. In the 2009 SEIS, the NRCS provided a detailed discussion of various mitigation measures it would take to reduce wetlands effects. It is enough, for purposes of the NEPA, to demonstrate that the NRCS took a hard look at the effects its action would have on wetlands and that it developed plans to mitigate those effects.

## H.

Appellants lastly contend that the NRCS violated the NEPA by failing to invite the Army Corps of Engineers to participate in preparing the 2009 SEIS as a cooperating

agency despite learning that it needed to obtain a Clean Water Act Section 404 permit from the Army Corps.

Lead agencies must request that agencies having "jurisdiction by law" participate in the NEPA process as cooperating agencies. 40 C.F.R. § 1501.6. Agencies have jurisdiction by law if they possess "authority to approve, veto, or finance all or part of the proposal." *Id.* § 1508.15. Once requested, cooperating agencies are required to participate in the NEPA process. *Id.* § 1501.6(b)(1).

Even assuming that the NRCS did not ask the Army Corps to participate as a cooperating agency and that it should have done so, such error was harmless. *See United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 37 (1st Cir. 2011) (recognizing that harmless-error review applies to violations of the NEPA). Despite bearing the burden to establish harm, *see id.*, Appellants fail to show, or even suggest, any harm that resulted from the failure to designate the Army Corps as a cooperating agency. Nor do we identify any harm resulting from this failure. In fact, the record reflects that the NRCS provided the Army Corps opportunities to participate in preparing both the 2007 SEIS and the 2009 SEIS, and that the Army Corps took advantage of at least some of these opportunities. It not only provided a letter in October 2006 commenting on the draft leading to the 2007 SEIS, but it also participated in a wetlands delineation and conference calls and meetings regarding Site 16 prior to the issuance of the 2009 SEIS. It is evident that the Army Corps provided input that assisted the NRCS's preparation of the 2009 SEIS.

Alternatively, Appellants argue that the NRCS should not have issued the 2009 SEIS prior to receiving the Clean Water Act Section 404 permit from the Army Corps. But we are aware of no requirement that the NRCS obtain necessary permits before issuing an EIS. To the contrary, the CEQ's regulations mandate only that it list all necessary federal permits in a draft EIS. *See* 40 C.F.R. § 1502.25(b). Thus, the NRCS's

issuance of the 2009 SEIS before obtaining the requisite permit from the Army Corps does not violate the NEPA.

## IV.

For these reasons, we affirm the decision of the district court.

*AFFIRMED*