**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1960

AMERICAN WHITEWATER; AMERICAN CANOE ASSOCIATION; GEORGIA
CANOEING ASSOCIATION; ATLANTA WHITEWATER CLUB; FOOTHILLS
PADDLING CLUB; WESTERN CAROLINA PADDLERS; JOSEPH C. STUBBS;
BRUCE A. HARE; KENNETH L. STRICKLAND,

Plaintiffs – Appellants,

v.

THOMAS TIDWELL, in his official capacity as Chief of the
United States Forest Service; UNITED STATES FOREST SERVICE,
an agency of the United States Department of Agriculture;
THOMAS J. VILSACK, in his official capacity as Secretary of
the United States Department of Agriculture; UNITED STATES
DEPARTMENT OF AGRICULTURE,

Defendants – Appellees,

and

ELIZABETH AGPAOA, Regional Forester Southern Region United
States Forest Service; MONICA J. SCHWALBACH, Acting Forest
Supervisor Francis Marion and Sumter National Forests;
MARISUE HILLARD, Forest Supervisor National Forests in North
Carolina; GEORGE M. BAIN, Forest Supervisor Chattahoochee-
Oconee National Forests,

Defendants,

RICHARD RUST; HENRY RUST; GOODENOW LLC; GEORGIA FORESTWATCH,

Intervenors – Appellees.

AMERICAN WHITEWATER; AMERICAN CANOE ASSOCIATION; GEORGIA CANOEING ASSOCIATION; ATLANTA WHITEWATER CLUB; FOOTHILLS PADDLING CLUB; WESTERN CAROLINA PADDLERS; JOSEPH C. STUBBS; BRUCE A. HARE; KENNETH L. STRICKLAND,

Plaintiffs – Appellees,

v.

THOMAS TIDWELL, in his official capacity as Chief of the United States Forest Service; UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture; THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture; UNITED STATES DEPARTMENT OF AGRICULTURE; ELIZABETH AGPAOA, Regional Forester Southern Region United States Forest Service; MONICA J. SCHWALBACH, Acting Forest Supervisor Francis Marion and Sumter National Forests; MARISUE HILLARD, Forest Supervisor National Forests in North Carolina; GEORGE M. BAIN, Forest Supervisor Chattahoochee-Oconee National Forests,

Defendants,

GEORGIA FORESTWATCH,

Intervenor,

and

RICHARD RUST; HENRY RUST; GOODENOW LLC,

Intervenors – Appellants.

AMERICAN WHITEWATER; AMERICAN CANOE ASSOCIATION; GEORGIA CANOEING ASSOCIATION; ATLANTA WHITEWATER CLUB; FOOTHILLS

PADDLING CLUB; WESTERN CAROLINA PADDLERS; JOSEPH C. STUBBS; BRUCE A. HARE; KENNETH L. STRICKLAND,

        Plaintiffs – Appellees,

      v.

THOMAS TIDWELL, in his official capacity as Chief of the United States Forest Service; UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture; THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture; UNITED STATES DEPARTMENT OF AGRICULTURE; ELIZABETH AGPAOA, Regional Forester Southern Region United States Forest Service; MONICA J. SCHWALBACH, Acting Forest Supervisor Francis Marion and Sumter National Forests; MARISUE HILLARD, Forest Supervisor National Forests in North Carolina; GEORGE M. BAIN, Forest Supervisor Chattahoochee-Oconee National Forests,

        Defendants,

RICHARD RUST; HENRY RUST; GOODENOW LLC,

        Intervenors,

     and

 GEORGIA FORESTWATCH,

        Intervenor – Appellant.

————————

Appeals from the United States District Court for the District of South Carolina, at Anderson.  Mary G. Lewis, District Judge. (8:09-cv-02665-MGL)

————————

Argued: September 17, 2014      Decided: November 5, 2014

————————

Before KING and HARRIS, Circuit Judges, and HAMILTON, Senior Circuit Judge.

————————

Affirmed by published opinion. Judge Harris wrote the opinion, in which Judge King and Senior Judge Hamilton joined.

———————————

**ARGUED:** James Nathan Galbreath, NELSON GALBREATH, LLC, Greenville, South Carolina, for Appellants/Cross-Appellees. Rachel Susanna Doughty, GREENFIRE LAW, Berkeley, California; Richard Stephen Doughty, Hendersonville, Tennessee; Nina C. Robertson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees/Cross-Appellants. **ON BRIEF:** R. Brian Hendrix, Collin O'Connor Udell, JACKSON LEWIS LLP, Reston, Virginia; Cecil H. Nelson, Jr., NELSON GALBREATH, LLC, Greenville, South Carolina, for Appellants/Cross-Appellees. Robert G. Dreher, Acting Assistant Attorney General, John P. Tustin, Ellen J. Durkee, Appellate Section, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; John H. Douglas, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina; Matthew A Tilden, UNITED STATES DEPARTMENT OF AGRICULTURE, Washington, D.C., for Appellees/Cross-Appellants. D. Kent Safriet, Mohammad O. Jazil, HOPPING GREEN & SAMS, P.A., for Intervenors-Appellees/Cross-Appellants Richard Rust, Henry Rust, and Goodenow LLC. Alexander M. Bullock, KILPATRICK TOWNSEND & STOCKTON, Washington, D.C., for Intervenor-Appellee/Cross-Appellant Georgia ForestWatch.

———————————

PAMELA HARRIS, Circuit Judge:

In 1974, Congress selected the 57 miles of the Chattooga River (the "Chattooga" or the "River") and 15,432 acres of adjacent land for preservation under the Wild and Scenic Rivers Act (the "WSRA" or the "Act"), 16 U.S.C. § 1274 et seq. (2006). Since then, the United States Forest Service (the "Forest Service") has managed the Chattooga under the WSRA.

Prior to 2012, longstanding Forest Service policy allowed non-motorized rafting or "floating"[1] on the lower portions of the Chattooga, but prohibited the practice on the 21-mile northernmost section of the River (the "Headwaters"). In 2012, after a lengthy review, the Forest Service revised its management plan for the Chattooga to allow floating on most of the Headwaters during the winter months, when flows are highest and conditions are best.

American Whitewater,[2] Plaintiff-Appellant, argues that the revised plan does not go far enough and that the remaining limits on floating are inconsistent with the WSRA and arbitrary and capricious in violation of the Administrative Procedure Act

---

[1] We use the term "floating" throughout to refer to the class of hand-powered, river-going recreational activities that includes canoeing, kayaking, and whitewater rafting.

[2] Together with several other not-for-profit hobbyist organizations and interested individuals, "American Whitewater."

(the "APA"). 5 U.S.C. § 702 et seq. (2006). On the other hand, two intervening parties, Georgia ForestWatch ("ForestWatch"), a not-for-profit environmental group, and the Rust family (the "Rusts"), argue that the Forest Service's decision to allow any floating already goes too far. They contend that the WSRA prohibits any floating on the Headwaters whatsoever, and that the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. (2006), in the course of reaching its decision.

The district court rejected both sets of challenges and found that the Forest Service's revised plan "carefully balance[s] the wide-ranging interests advocated by the several parties and participants." American Whitewater v. Tidwell, 959 F. Supp. 2d 839, 860 (D.S.C. 2013) ("Tidwell"). We agree with the district court's well-reasoned opinion and affirm.

## I.

### A.

The WSRA establishes a national policy to preserve rivers of "outstandingly remarkable value." Once designated under the WSRA, rivers are managed by an administrative agency — in this case, the Forest Service — to prevent degradation of their condition and preserve their pristine quality for future generations. See 16 U.S.C. §§ 1271, 1274, 1281(a) (2006). The

6

statutory command is twofold:  the outstandingly remarkable values, or "ORVs," that led Congress to designate the river must be "protecte[d] and enhance[d]," while other uses may be limited if they substantially interfere with the public's use of those ORVs.  16 U.S.C. §§ 1271, 1281(a).

The Forest Service manages the Chattooga through the Chattooga Wild and Scenic Development Plan.  As relevant here, the original 1976 version of the plan — as well as each of the subsequent versions published in 1985, 2002 and 2004 — limited floating to the lower portions of the Chattooga.

American Whitewater first challenged the Forest Service's ban on floating on the Headwaters in 2002.  In 2005, a Forest Service Reviewing Officer agreed with American Whitewater and found that the 2004 development plan did not "provide an adequate basis for continuing the ban" on floating on the Headwaters.  J.A. at 587.[3]  He directed the Forest Service to study the issue and prepare a new plan in accordance with its results.  Id.

To comply with the Reviewing Officer's ruling, the Forest Service began by preparing an action plan to establish capacity limits for use of the Chattooga and to measure the expected

---

[3] Citations herein to "J.A. at __" refer to the contents of the Joint Appendix filed by the parties in this matter.

7

impact of Headwaters floating on the Chattooga's ORVs. It then integrated a wide range of data on compatible recreational uses of the Headwaters in a 2007 report entitled Capacity & Conflict on the Upper Chattooga River (the "2007 Report"). The Forest Service also actively involved the public. It held six well-attended meetings to explain the review process and solicit feedback. Over seven years, members of the public submitted more than 4,300 responses and comments.

These efforts culminated in a 2012 Environmental Assessment presenting the Forest Service's findings. The Forest Service reached three conclusions of note here. First, it found that solitude, the "opportunit[y] for remoteness . . . in a spectacular scenic setting," was important to many users of the Headwaters. J.A. at 962. Second, it found that there was a significant likelihood of user conflict between floaters and anglers were the Headwaters floating ban to be lifted completely. J.A. at 981-82, 1273. Third, it determined that floating conditions are optimal during the winter months when flows are heavy, and that fishing conditions are less ideal during that same time period. J.A. at 974-76.

In connection with these findings, the Forest Service analyzed several alternative plans for the Headwaters, ranging from leaving the ban on floating in place and unchanged to lifting the ban completely. The alternative it selected,

8

numbered Alternative 13A, falls in the middle of that range.  It permits floating on the Headwaters, an activity that the Forest Service had not allowed since 1976, but subjects that floating to certain limits.  Specifically, floating is permitted on most of the Headwaters between December 1 and April 30, on days when flows are greater than 350 cubic feet per second.  The Forest Service explained that this would allow for floating "in the section of the Chattooga . . . that boaters rated highest for creek boating" and at the time of year "historically offer[ing] the best flows for these types of boating opportunities," while also preserving "opportunities for year round boat-free, cold water angling" in the reach that "attracts the highest angling use" and "provides the least challenging area for whitewater boating."  J.A. at 1402-03.

Because the Forest Service determined that Alternative 13A would not have a "significant impact on the human environment," it found that NEPA did not require preparation of an Environmental Impact Statement.  Instead, the Forest Service released its decision through a Decision Notice and Finding of No Significant Impact (together with the 2012 Environmental Assessment, the "2012 Decision").

**B.**

American Whitewater filed its first complaint in this action on October 14, 2009, while the study process was still

9

ongoing and before the Forest Service decided to partially lift the restrictions on floating. The Rusts, who own approximately 1.7 miles of the Headwaters' shoreline, intervened, seeking a declaratory judgment that the portion of the Headwaters running through their property is not navigable and thus outside the Forest Service's authority, and an injunction against any future attempt by the Forest Service to manage this portion of the Chattooga. American Whitewater filed an amended complaint, eliminating the allegations related to the portion of the Chattooga running through the Rusts' property, and the district court dismissed the Rusts' claims for lack of a "case or controversy" under Article III of the Constitution. American Whitewater v. Tidwell, No. 8:09-cv-02665-JMC, ECF No. 151 (Feb. 22, 2012).

ForestWatch moved to intervene in August of 2011, in support of the Forest Service's then-existing ban on Headwaters floating. The district court granted ForestWatch's motion on May 1, 2012, after publication of the 2012 Decision partially lifting the floating ban. However, the district court limited the scope of ForestWatch's intervention to defending the Forest Service against American Whitewater's challenge to the remaining floating restrictions. American Whitewater v. Tidwell, No. 8:09-cv-02665-JMC, ECF No. 168 (May 1, 2012).

10

After publication of the 2012 Decision, American Whitewater filed its second amended complaint, arguing that the remaining limits on floating violate the WSRA. In the alternative, American Whitewater argued that the Forest Service's decision violates the APA because the Forest Service did not have an adequate basis for its conclusion that restrictions on floating are needed to balance competing recreational uses on the Chattooga. See 5 U.S.C. § 706(2)(A) (2006).

ForestWatch and the Rusts also were dissatisfied with the 2012 Decision. ForestWatch, arguing that the remaining limits on floating are insufficiently strict to meet the WSRA's mandate, filed a separate action in the district court. See Georgia ForestWatch v. Bradley, No. 8:12-cv-3455-MGL (Dec. 6, 2012). The district court denied a motion to consolidate the two actions, and ForestWatch's lawsuit remains pending today. The Rusts also refiled their cross-claims, seeking a declaration that the Headwaters running through their property are non-navigable and asserting that the Forest Service's analysis did not satisfy NEPA.

The district court granted the Forest Service's motion for judgment on the administrative record on April 16, 2013. It rejected each of American Whitewater's claims, as well as the Rusts' NEPA claims, holding that the record provided ample support for the Forest Service's determination that conflicts

11

between floaters and other recreational users justified the remaining floating restrictions and that the Forest Service complied with NEPA.  It also dismissed the Rusts' request for declaratory judgment as premature, and refused to consider ForestWatch's claims against the Forest Service because they went beyond the limited scope of its intervention.  These timely appeals followed.

## II.

The crux of American Whitewater's claim is that the Forest Service struck the wrong balance when it opened the Headwaters to floating partially but not entirely, maintaining some restrictions on floating in order to avoid conflicts with other recreational users.  According to American Whitewater, there is no basis in the record for the Forest Service's concern about potential conflicts, and the remaining restrictions are arbitrary and capricious under the APA as well as contrary to the WSRA.  Like the district court, we disagree.

## A.

We review the district court's grant of judgment on the administrative record *de novo*.  Crutchfield v. Cnty. of Hanover, 325 F.3d 211, 217 (4th Cir. 2003).  But like the district court's, our review under the APA is "ultimately narrow and highly deferential."  Webster v. U.S. Dep't of Agric., 685 F.3d

12

411, 422 (4th Cir. 2012). We may set aside an agency's action under the APA only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006). In determining whether an agency action is arbitrary, capricious, or otherwise an abuse of discretion under the APA, a reviewing court must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." N.C. Wildlife Fed'n v. N.C. Dep't of Transp., 677 F.3d 596, 601 (4th Cir. 2012) (alteration in original) (quoting F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009)). But so long as the agency "provide[s] an explanation of its decision that includes a rational connection between the facts found and the choice made," its decision should be sustained. Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)) (internal quotation marks omitted). Our review is particularly deferential when, as is the case here, "resolution of th[e] dispute involves primarily issues of fact" that implicate "substantial agency expertise," Marsh v. Or. Natural Res. Council, 490 U.S. 360, 376-77 (1989), and the agency is tasked with balancing often-competing interests. See Hells Canyon Alliance v. U.S. Forest Serv., 227 F.3d 1170, 1182 (9th Cir. 2000).

13

We do not doubt that in this case there is a "rational connection between the facts found and the choice made," Ohio Valley Envtl. Coal., 556 F.3d at 192. The alternative selected by the Forest Service opens substantial portions of the Headwaters for the first time to floating, from the months of December to April on days when flows exceed 350 cubic feet per second. As the 2012 Decision explains, this option allows for floating when water conditions are best, and also easiest to predict, so that users can plan ahead to take advantage of the best opportunities for Headwaters floating. J.A. at 1459. At the same time, by retaining the ban on floating during the spring and summer months, the Forest Service has addressed the documented concerns expressed by other recreational users of the Headwaters, providing for a floater-free environment when conditions are best for fishing and hiking. J.A. at 1460-61. The Forest Service also tailored the remaining restrictions by reach, reserving four miles of the Headwaters with the least challenging floating conditions, but some of the best angling opportunities, for fishermen. J.A. at 1460. Finally, as described in the 2012 Decision, the Forest Service's balance between competing uses also complies with the maximum capacities for the Headwaters as set out in the 2007 Report. J.A. at 1458.

Contrary to American Whitewater's assertions, the record amply supports the Forest Service's conclusions regarding

14

potential conflicts among recreational users. The Forest Service relied in part on a history of previous conflicts between recreational users, reviewing evidence from the Headwaters prior to the floating ban, from the lower portion of the Chattooga where floating always has been permitted, and from several proxy rivers. And it assembled significant data pointing to the potential for future conflicts, counting cars to estimate usage, developing expected encounter estimates, and analyzing a wealth of public comments including many from current users who expressed a preference for solitude and an isolated experience. J.A. at 966, 959-1038, 1031-32, 960-62, 1273-74; see also Tidwell, 959 F. Supp. 2d at 853.

American Whitewater argues that the Forest Service was required to authorize floating during the study period before it could accurately assess the likelihood of conflicts on the Headwaters. In other words, in order to justify maintenance of its existing restrictions, the Forest Service first would have to eliminate them so that recreational users could experience actual conflicts. Br. for American Whitewater at 35. We cannot accept this counter-intuitive argument. Where the agency's conclusion otherwise rests on a firm factual basis, nothing in the APA requires it to experiment with a practice before continuing preexisting policies. We will not second guess an agency's reasonable choice of methodology. See Hughes River

15

*Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1999).

At bottom, American Whitewater disagrees with the Forest Service's factual conclusions and the balance it chose to strike. But the APA does not give us license to second-guess an agency's well-reasoned decision simply because a party disagrees with the outcome. The Forest Service has provided a cogent justification for the remaining limits on Headwaters floating, supported by the record, and that is sufficient to sustain its decision under the APA.

**B.**

American Whitewater also contends that the Forest Service's remaining restrictions on Headwaters floating violate § 1281 of the WSRA, which requires the Forest Service to "protect and enhance the values which caused" the Chattooga to be designated for preservation "without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. § 1281(a). American Whitewater argues, first, that "floating" is a value that led Congress to designate the Chattooga, and that under the "protect and enhance" standard, the Forest Service has no choice but to lift all restrictions on floating. Second, American Whitewater argues that floating cannot be limited because it does not "substantially interfere" with any protected

16

recreational use of the Headwaters.  Like the district court, we disagree on both counts.

## 1.

When Congress designated the Chattooga for preservation under the WSRA, it did not expressly identify the River's ORVs. In such cases, that task falls to the relevant administrative agency, which must define a river's "values" in accordance with published interagency guidelines.  See Interagency Wild and Scenic Rivers Coordinating Council, The Wild & Scenic River Study Process 12-15 (1999).  Here, the Forest Service identified "recreation" generally, as opposed to specific recreational uses such as floating or fishing, as an ORV of the Chattooga.  J.A. at 915.  American Whitewater argues that the Forest Service erred, and that floating itself is an ORV subject to the Act's "protect and enhance" standard.  Like the district court, we find that the Forest Service's decision to designate "recreation" as the relevant ORV was entirely reasonable, and that floating is not a Chattooga River value that must be "protecte[d] and enhance[d]" under the WSRA.

To begin with, although the WSRA does not define "outstandingly remarkable values," its text seems to contemplate general categories such as "recreational value," rather than specific uses such as "hiking" and "fishing."  Section 1271 of the WSRA lists the "outstandingly remarkable" values that are to

17

be protected by the Act: "scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values." 16 U.S.C. § 1271 (2006). "Floating value" is not "similar" to, say, "historical value"; it is pitched at an entirely different level of specificity. The phrase "other similar values" is most naturally read to refer to ORVs at the same level of categorical generality as the examples listed before it. See Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 384 (2003) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.") (citations omitted); Sokol v. Kennedy, 210 F.3d 876, 879 n.5 (8th Cir. 2000) (reading "values" in § 1281(a) together with the list of enumerated values in § 1271).

Notwithstanding the awkward textual fit, American Whitewater insists that Congress intended to identify floating as a protected value when it designated the Chattooga under the WSRA. In fact, the Forest Service's decision to identify "recreation" as the relevant value is fully consistent with the congressional record. For example, the 1971 Forest Service report that led to Congress's designation of the Chattooga as a protected river does not single out floating from other forms of recreation; instead, it identifies "hiking, floating — including

18

canoeing and rafting — and primitive camping" as potential uses of the Chattooga "recreation resource." Designation would be desirable, according to the 1971 report, because it would preserve not just one particular form of recreation, but rather "full enjoyment of river-related recreation activities" in general. The Senate and House Reports accompanying the Chattooga's designation under the WSRA likewise refer to a variety of "recreational" possibilities without giving special status to any one recreational use or pursuit.

The out-of-context references to floating cited by American Whitewater do not persuade us otherwise. For example, American Whitewater quotes this passage from the 1971 report: "To see and enjoy much of the river requires considerable time and effort from the recreationist, whether he be fisherman, canoeist, hiker or camper." But this passage, like the others cited by American Whitewater, actually is more consistent with the Forest Service's identification of recreation writ large as the relevant ORV, in its description of floating as only one recreational use among many.

American Whitewater has not challenged the Forest Service's discretion to identify ORVs when Congress has not done so. Cf. Interagency Wild and Scenic Rivers Coordinating Council, supra, at 12-15; Sokol, 210 F.3d at 879-80 (in setting boundaries for protected river areas, agencies must identify and seek to

19

protect ORVs).  In this case, the Forest Service made its determination after careful consideration of relevant administrative guidance and voluminous reports describing the Chattooga's characteristics.  J.A. at 913-19.  We find that the Forest Service reasonably and lawfully identified "recreational value" as the relevant ORV, and that floating is not a value of the Chattooga that must be protected and enhanced under § 1281.

**2.**

As the Forest Service recognized, its determinations about how best to protect and enhance the Chattooga's recreational ORV necessarily involve "trade-offs" among competing recreational uses.  J.A. at 915.  Congress left the requisite calibration to the Forest Service, providing in § 1281 that agency management plans "may establish varying degrees of intensity" for protection based on "special attributes" of a river, 16 U.S.C. § 1281(a), and the balance struck by the Forest Service here is entitled to substantial deference.  See Hells Canyon Alliance, 227 F.3d at 1174-75.

Nevertheless, American Whitewater argues that under the terms of § 1281, the Forest Service may not restrict floating in any way because it has not shown that floating "substantially interferes" with other recreational uses.  The district court rejected this claim, holding that the record supported a finding of "substantial interference."  Tidwell, 959 F. Supp. 2d at 852-

20

While we agree with that assessment, we also think that American Whitewater's argument is flawed in its premise: Floating is itself a "public use" of the recreational value, not an "other use" subject to the substantial interference standard.

Section 1281(a) divides "uses" of designated rivers into two mutually exclusive categories: There are "public use[s]" of ORVs, like the recreational value identified in this case; and then there are "other use[s]," to be limited when they interfere substantially with public use and enjoyment of an ORV. For instance, hiking would be a "public use" of the Chattooga's recreational value; operating a highway, on the other hand, might be an "other use" subject to restriction if it substantially interfered with hiking or any other component of the recreational ORV. Floating clearly is a form of "public use and enjoyment" of the Chattooga's recreational value. It cannot also be an "other use" or the statutory scheme would make no sense, directing the Forest Service to limit floating in order to protect it. Because floating is not an "other use" for purposes of § 1281(a), limits on floating are not governed by the substantial interference standard.[4]

---

[4] In its brief, the Forest Service addressed this claim by defending the record on "substantial interference," which we address in turn. At oral argument, however, the Forest Service made clear that it was not conceding American Whitewater's
(Continued)

In any event, we agree with the district court that the record evidence of user conflict developed by the Forest Service, discussed above, is sufficient to show that floating can interfere substantially with other recreational uses. Tidwell, 959 F. Supp. 2d at 853-54. For that reason, as well, we hold that the remaining restrictions on floating on the Headwaters are consistent with the WSRA.[5]

## III.

The Rusts present a narrower challenge to the 2012 Decision, intended to protect what they see as their private property rights in land along the Headwaters. First, they ask us to declare the 1.7-mile portion of the Headwaters running through their land non-navigable, which would make it private property rather than a public waterway and preclude any Forest Service attempt to provide public access. Second, the Rusts argue that the 2012 Decision is invalid under NEPA because the

reading of the statute or application of the substantial interference standard.

[5] We reject American Whitewater's remaining claims for the reasons given by the district court. The record adequately supports the continued ban on floating on the Chattooga's tributaries. Tidwell, 959 F. Supp. 2d at 857-58. And American Whitewater's challenges based on the Forest Service's policy manual fail at the outset because the policy manual does not have the force of law. Id. at 864.

22

Forest Service failed to provide a sufficiently detailed analysis of the risk that floaters would trespass across their land to reach newly opened portions of the Headwaters.

**A.**

To be clear, the 2012 Decision does not authorize any floating on the Rusts' property. It does not cover the portion of the Headwaters that concerns the Rusts at all, in accordance with Forest Service policy treating rivers as non-navigable and private until found otherwise. J.A. at 943. Nor has the Forest Service taken any steps toward a determination of navigability. Absent any attempt by the Forest Service even to lay the groundwork for an exercise of its regulatory authority, the Rusts' request for a declaratory judgment fails to present a justiciable controversy.

We may address only disputes that are "definite and concrete, touching the legal relations of parties having adverse interests." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41 (1937). The same standard applies to a request for declaratory relief and requires a controversy of "sufficient immediacy and reality [as] to warrant the issuance of a declaratory judgment." White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 913 F.2d 165, 167-68 (4th Cir. 1990) (quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)).

23

The Rusts' claims do not meet this standard. The Rusts acknowledge that the Forest Service would need to take additional action before it could manage this portion of the Chattooga. The Forest Service has not done so. Nor has it argued that this portion of the Chattooga is subject to Forest Service oversight. In fact, the Rusts agree that the Forest Service has consistently treated this segment of the Chattooga as non-navigable, private, and outside its authority. J.A. at 943; S.J.A. at 2199. To the extent that American Whitewater could be considered an adverse party in this context — which we doubt — it too disavows any attempt to declare this section of the Chattooga navigable. Reply Br. for American Whitewater at 21, 22.

We will not issue an advisory opinion, addressing a question that is not in actual dispute. Flast v. Cohen, 392 U.S. 83, 96 (1968) ("[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions."); Shenandoah Valley Network v. Capka, 669 F.3d 194, 202 (4th Cir. 2012) ("[A] dispute is lacking here — and because we cannot issue an advisory opinion — we have no authority to adjudicate this suit."). The Rusts' declaratory judgment claim is dismissed.

**B.**

The Rusts also argue that the Forest Service violated NEPA by failing to analyze the risk that opening portions of the Headwaters to floating could lead to trespass on Rust property. They insist that floaters are likely to attempt to reach the River by crossing their property illicitly, instead of using the trails and parking lots already available to the public. The district court correctly held that this prospect is so speculative that no NEPA analysis is required.

NEPA encourages conservation not by imposing substantive obligations on agencies, but by requiring that agencies consider the environmental consequences of their actions and present them to the public for debate. Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 184, 185 (4th Cir. 2005). Accordingly, our review under NEPA is limited to ensuring that an agency has taken a "hard look" at the environmental impacts of a proposed action. Id. at 185. Moreover — and dispositive here — an agency need consider only the "reasonably foreseeable" effects of its decisions. See Webster, 685 F.3d at 429 ("[A]lthough agencies must take into account effects that are reasonably foreseeable, they generally need not do so with effects that are merely speculative."); see also 40 C.F.R. § 1508.8 (2008).

Any possible increase in the risk of trespass on the Rusts' land does not meet this standard. As the Forest Service points

25

out, the uppermost portion of the Headwaters opened to floating by the 2012 Decision is downstream from the Rusts' property line. The uppermost put-in location is another quarter-mile further downstream and easily accessible to the public via a trail from the existing Green's Creek parking lot. Nothing in the record gives us reason to think that floaters would prefer a less direct path across the Rusts' uncleared land. The situation might be different if the Forest Service had allowed floating upstream of the Rusts' land — but the agency rejected that option, precisely because it might present an increased risk of trespass. J.A. at 779, 911, 943.

The Rusts' response to this common-sense proposition is unconvincing. They rely on a few comments submitted by American Whitewater during the review process predicting that floaters would prefer to and eventually would launch from Grimshawe's Bridge, north of the Rusts' property. That, however, is a far cry from expressing an intent to trespass illegally, and American Whitewater has denied repeatedly that it intends to violate the law. Otherwise, the Rusts point to a trespasser's account from forty years ago and a stray newspaper report. Neither explains why floaters might be expected to trespass under the Headwaters' present conditions.

Even assuming that a heightened risk of trespass was reasonably foreseeable, the Forest Service's discussion of that

26

risk satisfies NEPA. The Forest Service presented the Rusts' concerns to the public and explained that they were addressed by the continued ban on floating above Green's Creek, and the Rusts' property. J.A. at 911, 943. In this context, that discussion was sufficient; agencies have discretion to determine which issues merit detailed discussion, and here the risk of trespass or any associated environmental impact was not so significant that more was required. See Nat'l Audubon Soc'y, 422 F.3d at 186 ("A 'hard look' is necessarily contextual."); Izaak Walton League of Am. v. Marsh, 655 F.2d 346, 377 (D.C. Cir. 1981) ("Detailed analysis is required only where impacts are likely."). Review under NEPA is not a vehicle for "flyspeck[ing]" agency analysis and discussion, Nat'l Audubon Soc'y, 422 F.3d at 186, and we find that the Forest Service has met its NEPA obligations.[6]

**IV.**

Finally, we have the claims of ForestWatch, which, like the Rusts, intervened in this case below. The district court

---

[6] In light of our disposition of the Rusts' claims we need not address the Rusts' motion to strike from the record certain features of maps included in the Forest Service's brief. American Whitewater v. Tidwell, Case No. 13-1960, ECF No. 112 (Sept. 11, 2014). We have not relied on the contested features and they have played no role in our decision. Accordingly, the Rusts' motion to strike is dismissed.

limited the scope of ForestWatch's intervention to defending the Forest Service's remaining restrictions on floating on the Headwaters. ForestWatch now takes a different tack, arguing that the Forest Service erred by permitting any floating at all, and raising claims against the partial lifting of the floating ban under NEPA and the WSRA. These claims, the subject of a separate ForestWatch action against the Forest Service now pending before the district court, go well beyond the scope of ForestWatch's clearly delineated interest in this litigation and are dismissed.

The district court carefully cabined ForestWatch's involvement in this litigation to the terms of its intervention order, striking ForestWatch's plea for relief against the Forest Service as beyond the scope of its intervention. See American Whitewater v. Tidwell, No. 8:09-cv-02665-MGL, ECF No. 254 (Feb. 25, 2013) (text order). It did not reach ForestWatch's arguments against the Forest Service and the partial opening of the Headwaters to floating, instead explicitly "limit[ing] its findings to the parties with claims pending" in the case. Tidwell, 959 F. Supp. 2d at 850. The merits of ForestWatch's claims against the Forest Service will be considered by the district court in ForestWatch's separate action, not by this court for the first time on appeal. See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1227 (4th Cir. 1998) ("[I]ssues

28

raised for the first time on appeal generally will not be considered.") (internal quotation marks omitted).

What ForestWatch may appeal, however, is the underlying district court ruling on its motion to intervene. The district court granted ForestWatch's motion to intervene as of right but also limited ForestWatch to "[d]efending against [American Whitewater's] claim for declaratory and injunctive relief." American Whitewater v. Tidwell, No. 8:09-cv-02665-JMC, ECF No. 168 (May 1, 2012). ForestWatch now argues that the district court erred in imposing that limit on the scope of its intervention. Finding no reversible error, we affirm.

The parties dispute the appropriate standard for our review of the limits on ForestWatch's intervention, with ForestWatch arguing for *de novo* review and the Forest Service for an abuse of discretion standard. We need not reach this question because, as ForestWatch's counsel candidly admitted at oral argument, our review ultimately hinges on whether the district court's decision to limit intervention was fundamentally unfair. See Columbus-America Discovery Grp. v. Atlanta Mut. Ins. Co., 974 F.2d 450, 470 (4th Cir. 1992). Under any standard of review, there has been no fundamental unfairness here.

ForestWatch's argument to the contrary is that the district court did in fact address its claims against the Forest Service in resolving this case, so that ForestWatch will be denied the

opportunity to raise them again in its separate suit. We read the record differently, and believe that the district court amply preserved ForestWatch's opportunity to assert its claims in its pending lawsuit. First, in denying a motion to consolidate ForestWatch's action with the present case, the district court expressly found that "the outcome or result in one case i[s] not dispositive or dependent on the outcome of the other." J.A. at 1886-88.[7] It then proceeded to insulate one case from the other by explicitly limiting its decision below so as to exclude ForestWatch's claims against the Forest Service. Tidwell, 959 F. Supp. 2d at 850 ("[A]lthough the court has considered Georgia ForestWatch's arguments and will discuss them herein, the court limits its findings to the parties with claims pending in this case.").

ForestWatch points to snippets of language in the district court opinion affirming the 2012 Decision as evidence that its claims against that decision already have been decided against it. But read in context, those passages uphold the 2012

---

[7] To the extent that ForestWatch appeals from the district court's denial of its motion to consolidate, we affirm. The district court ably managed the range of parties and interests involved in this case, and we see no basis for disturbing its judgment about how best to manage its docket. See Arnold v. E. Airlines, Inc., 681 F.2d 186, 192 (4th Cir. 1982) (consolidation decisions are "necessarily committed to trial court discretion" and reviewed only for abuse of discretion).

Decision only as against the Rusts' or American Whitewater's claims, referenced in each case on the same page, if not in the same paragraph, as the cited language. We are confident that nothing in the district court's careful opinion will preclude ForestWatch from pressing its claims in its separate suit. Nor, we should note, should anything in our opinion today be understood as resolving ForestWatch's separate claims against the Forest Service.

## V.

For the reasons set forth above, we affirm the judgment of the district court.

AFFIRMED