**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 22-2285**

———————————

ROBERT MESTANEK; MARY MESTANEK,

        Plaintiffs – Appellants,

v.

UR M. JADDOU, Director, United States Citizenship and Immigration Services,

        Defendant – Appellee.

———————————

Appeal from the United States District Court for the District of South Carolina, at Charleston.  Bruce H. Hendricks, District Judge.  (2:20−cv−02811−BHH)

———————————

Argued:  December 5, 2023                         Decided:  February 13, 2024

———————————

Before WILKINSON, KING and THACKER, Circuit Judges.

———————————

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Thacker joined.

———————————

**ARGUED:**  Bradley Bruce Banias, BANIAS LAW, LLC, Charleston, South Carolina, for Appellants.  Julian Michael Kurz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C. for Appellee.  **ON BRIEF:**  Brian M. Boynton, Principal Deputy Assistant Attorney General, William C. Peachey, Director, District Court Section, Sarah Vuong, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————————

WILKINSON, Circuit Judge:

This appeal concerns the second of two Form I-130 petitions filed on behalf of Robert Mestanek, a native and citizen of the Czech Republic. Both petitions sought to establish that Robert was the bona fide spouse of a U.S. citizen and thus eligible for lawful permanent residence in the United States. The first petition was filed by Robert's then-wife Angel Simmons in August 2013, and the second by Robert's current wife Mary Mestanek in December 2015. U.S. Citizen and Immigration Services (USCIS) denied both petitions—the first because it found that Robert's marriage to Angel was fraudulent, and the second based on the "marriage fraud bar," which prohibits the approval of Form I-130 petitions on behalf of any noncitizen who has previously been found to have entered into a fraudulent marriage in order to circumvent immigration laws. *See* 8 U.S.C. § 1154(c).

Robert and Mary ("the Mestaneks") filed suit in federal district court seeking judicial review of USCIS's denial of Mary's Form I-130 petition. The district court granted summary judgment in favor of USCIS, and the Mestaneks timely appealed. Because we agree with the district court that USCIS's denial was neither arbitrary nor contrary to law, we affirm.

## I.

U.S. citizens seeking to obtain lawful permanent resident status for their noncitizen spouses must initiate the process by submitting to USCIS a Form I-130, Petition for Alien Relative. If USCIS determines that the marriage between the citizen and the noncitizen is bona fide, it approves the petition and officially recognizes the noncitizen as an "immediate relative" of the petitioner. The noncitizen may then apply for lawful permanent resident

2

status using Form I-485, Application to Register Permanent Residence or Adjust Status, which is often filed concurrently with the Form I-130 petition.

A citizen who files a Form I-130 petition on behalf of her spouse bears the burden of establishing that her spouse is eligible for the benefit. As part of that burden, she must establish not only the validity of her marriage to the noncitizen, but also "the legal termination of all previous marriages." 8 C.F.R. § 204.2(a)(2).

Additionally, USCIS is prohibited from approving any Form I-130 application on behalf of a noncitizen who "has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c)(2). This prohibition—known as the "marriage fraud bar"—applies not only to a petition predicated on a fraudulent marriage, but also to any future petitions filed on behalf of the same beneficiary, regardless of merit. *See* 8 U.S.C. § 1154(c)(1).

A.

Appellant Robert Mestanek entered the United States on a student visa in July 2005 to attend a language school in Florida. Although his visa expired in August of that year, Robert did not return to the Czech Republic. Instead, Robert remained in the United States without lawful status, at some point moving from Florida to Hilton Head, South Carolina. There Robert met Angel Simmons, and they married in February 2013.

Angel filed a Form I-130 petition on Robert's behalf a few months later seeking to establish him as her immediate relative, and Robert concurrently filed a Form I-485 application to adjust his immigration status. They submitted various documents in support

3

of their application, including joint tax returns, a lease agreement for the apartment they shared, and assorted photographs of the couple.

A USCIS officer interviewed Robert and Angel together in January 2014. Before the interview, the officer marked the marriage as potentially fraudulent because law enforcement reports indicated that Robert and Angel—contrary to what they wrote on their application—had been living at different addresses. At the interview, however, the couple maintained that they were still married and living together in South Carolina at the Hilton Head address listed on the petition. The officer ended the interview so he could conduct additional research, noting that the two were a "very unlikely couple." J.A. 917.

After conducting additional research, the officer scheduled a second interview in June 2014. This time, the officer interviewed Robert and Angel separately and asked them each a series of the same questions. Again, they each testified that they had been living together since February 2013 at the Hilton Head apartment listed on the petition. But information gathered during the officer's pre-interview research cast doubt on whether that was accurate. For example, traffic-court records from October and December 2013 listed a different address for Angel. Moreover, although Angel said that she had gone multiple times to the leasing office of the apartment complex where the couple allegedly resided together, the leasing manager had advised USCIS that, although she often saw Robert, she had seen Angel only once, when Angel came to the office to sign a new lease in March 2014.

The interviewer also noted several discrepancies between Robert's and Angel's answers at the second interview. For example, Angel said that she and Robert had spent

4

time apart only once since their wedding, when Robert went to a bodybuilding contest in Columbia, South Carolina, and stayed overnight. But Robert said that he had also been away several times to visit a friend in Orlando, Florida. And when the officer asked how the parties had traveled to their wedding, Angel testified that she and Robert drove together, while Robert said he rode separately with a friend.

After the interview, the officer referred the case to USCIS's Fraud Detection and National Security Directorate ("FDNS") for further investigation. FDNS investigated from September 2014 to April 2015 and determined that "the marriage strongly appear[ed] to be one of convenience and designed to provide an immigration benefit to [Robert]." J.A. 923. It also noted that Robert did "not appear to reside with [Angel] and may have moved to Florida." J.A. 919. But because "neither [Robert] nor [Angel] ha[d] made an admission of fraud," FDNS ultimately concluded that "insufficient info ha[d] been discovered to establish fraud" and categorized the fraud determination as "inconclusive." J.A. 920, 923.

While FDNS was still investigating, Robert and Angel's marriage started to falter, and Robert had indeed moved back to Florida. Robert initiated divorce proceedings in Florida in November 2014—just five months after USCIS's second interview. A Florida court granted the divorce in January 2015. A few months later Robert notified USCIS of the divorce and requested to withdraw his pending Form I-485 adjustment-of-status application. The agency issued an "acknowledgment of withdrawal" for Robert's application in February 2016. Angel's Form I-130 petition, however, was never withdrawn.

B.

5

During this time, Robert moved back to Hilton Head where he met his current wife, Mary. They dated briefly before marrying in November 2015. Soon after, Mary filed a Form I-130 petition on Robert's behalf, and Robert again filed a concurrent Form I-485 application. Robert and Mary were interviewed in connection with those petitions in April 2016. The adjudicating officer did not identify any discrepancies in their interview, but because Robert had been previously suspected of marriage fraud, the officer referred Mary's petition to FDNS as well. After an investigation, FDNS concluded that Robert and Mary lived together and that their marriage was likely genuine.

But there was another impediment to Mary's petition: it would have to be denied under the marriage-fraud bar if Robert's prior marriage to Angel was found fraudulent. At this point, Angel's Form I-130 petition was still pending and there had not yet been a conclusive fraud determination. Thus, FDNS reopened the investigation into Robert and Angel's marriage to determine whether Robert was subject to the marriage-fraud bar.

In connection with the renewed investigation, two FDNS agents met with Angel outside of a Starbucks in January 2017 to ask her about her marriage to Robert. At the meeting, which lasted less than an hour, Angel admitted to the agents that her marriage to Robert was fraudulent. She said that she had met Robert when they worked together briefly at a cleaning service. According to Angel, after she and Robert became friends he approached her about marrying him so that he could get a "green card"—a permanent residency permit. She told the agents that he promised her $10,000 to marry him and that she agreed because she was homeless and struggling financially. In the end, though, Angel

6

said that he had only given her $800, although he had promised the rest would come once his permanent residency status was confirmed.

Angel reported that, a few months after their marriage, she had cohabited with Robert briefly when she did not have another place to live, and that they had been intimate during that time. Angel, however, was starting to get cold feet. When she eventually decided that she did not want to continue with the sham marriage, she said that Robert became enraged and threatened to kill her if he was deported. She said that he also threatened her with a secretly recorded video tape of them having sex and an audio recording of them agreeing to engage in the sham marriage. At the end of the interview, Angel wrote out and signed a statement confessing to her role in the sham marriage. FDNS then returned the case to USCIS with a determination of "Fraud Found," J.A. 1063, and USCIS denied Angel's Form I-130 petition in May 2017.

A few days later, USCIS sent Mary a notice that it intended to deny her Form I-130 petition as well. The notice stated that the agency had found "substantial and probative evidence" that Robert had engaged in prior marriage fraud. J.A. 849. In support, it referenced Robert's and Angel's conflicting January 2014 interview answers. It also described Angel's January 2017 confession.

In response, Robert and Mary asked to inspect the record of proceedings. They also informed USCIS that they would be requesting a copy of their file through the Freedom of Information Act (FOIA) process. USCIS responded that it would issue the Mestaneks an amended notice with more detailed information, and that Mary and Robert would have thirty additional days to respond after that amended notice was issued.

USCIS did not issue the promised notice until three years later. In it, the agency reiterated that Robert was subject to the marriage-fraud bar based on his first marriage to Angel and provided a more detailed account of Angel's confession. But it also questioned whether Robert's marriage to Mary was valid. According to the agency, Robert had never successfully divorced from Angel because he had not satisfied Florida's statutory six-month residency requirement before filing for divorce in November 2014.

In support of this new ground for denying Mary's petition, the agency provided several pieces of evidence. First, it noted that Robert's second Form I-485 application indicated that he had resided in Florida only from August 2014 to January 2015. That meant that he had lived in Florida for only three months when he filed for divorce. Moreover, at Robert's June 2014 interview, he had testified that he was still living with Angel in Hilton Head and presented a lease to that effect. Based on those two pieces of evidence, USCIS concluded that Robert had lived in Florida for fewer than six months at the time he filed for divorce, and that the Florida court thus lacked jurisdiction to enter the divorce decree. Given that Robert had never validly divorced Angel, Mary had not met her burden to establish "the legal termination of all [Robert's] previous marriages." 8 C.F.R. § 204.2(a)(2).

Robert and Mary responded to the second notice of intent to deny with new rebuttal evidence, most notably a declaration signed by Angel in late January 2020 that said her prior confession was coerced and false and that she had written and signed the statement only because the FDNS agents had threatened her with jail if she did not do so.

8

After considering the rebuttal evidence, USCIS issued a decision denying Mary's Form I-130 petition in June 2020. First, it found that Angel's new declaration was not credible and that it conflicted with prior evidence and testimony from earlier interviews. Second, it found that Robert had not rebutted the agency's finding that he had not established Florida residency at the time of his petition for divorce. It thus denied Mary's Form I-130 petition and denied Robert's Form I-485 application as well.

C.

Mary chose not to file an administrative appeal with the Board of Immigration Appeals. Instead, the Mestaneks sought judicial review of USCIS's denial of their petitions in the U.S. District Court for the District of South Carolina under the Administrative Procedure Act (APA). The parties cross-moved for summary judgment.

The Mestaneks' motion set forth several arguments: (1) that USCIS's denial of Mary's petition was ultra vires because Congress had not authorized USCIS to undertake "investigations" like the one that resulted in Angel's confession; (2) that the certified administrative record provided by USCIS was incomplete; (3) that USCIS's denial was arbitrary and capricious because it applied the wrong legal standard for marriage fraud; (4) that USCIS violated its own regulations when it refused to allow the Mestaneks to inspect the record of proceedings after issuing the notice of intent to deny; (5) that USCIS misapplied Florida law when it deemed Robert's Florida divorce decree invalid; (6) that USCIS had ignored key evidence throughout its decision and failed to give due credit to Angel's 2020 recantation; and (7) that USCIS violated the Mestaneks' due process rights.

USCIS's motion countered each of the Mestaneks' grievances, arguing that none gave the court grounds to set aside the agency's decision. In a thorough and well-reasoned order, the district court agreed with USCIS that each of the Mestaneks' claims was without merit and thus granted summary judgment to USCIS. *Mestanek v. Jaddou*, No. 2:20-CV-2811-BHH, 2022 WL 17841270, at *7 (D.S.C. Dec. 14, 2022). The Mestaneks timely appealed.

## II.

On appeal, the Mestaneks make largely the same arguments as they did in the district court. We review a district court's evaluation of an agency action challenged under the APA de novo, "independently assess[ing] whether, based on the administrative record, the agency action was unlawful." *Ren v. USCIS*, 60 F.4th 89, 93 (4th Cir. 2023). In accordance with the APA, we look only at whether an agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). Thus, we will uphold an agency's decision so long as we find that the agency "acted within a zone of reasonableness." *Id.* (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

After reviewing the record, we agree with the district court that the Mestaneks' arguments are unavailing. We take each argument in turn.

## A.

The Mestaneks start with the ambitious claim that USCIS lacks the authority to investigate marriage fraud when adjudicating Form I-130 petitions. In essence, they argue that the Homeland Security Act of 2002 prohibited USCIS from undertaking any

10

investigations unless specifically authorized to do so by Congress in subsequent legislation. But the Homeland Security Act is not as disabling to the workings of our immigration laws as the Mestaneks contend it to be.

Before the Homeland Security Act, federal immigration laws and regulations were administered by the Immigration and Naturalization Service (INS), which was housed in the Department of Justice and overseen by the Attorney General. The Homeland Security Act abolished the INS and transferred most of its functions to three new entities: USCIS, U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Patrol (CBP). These entities were housed within the newly created Department of Homeland Security (DHS) under the purview of the new Secretary of Homeland Security.

The Mestaneks are correct that the Homeland Security Act generally assigned INS's adjudicative functions to USCIS and its investigative program to the subagencies that would become ICE and CBP. *See* 6 U.S.C. § 271(b); 6 U.S.C. § 251(4). But they take this general division of labor and read in a hardline prohibition that finds no support in the statutory text. Nowhere in the Homeland Security Act does it restrict the new subagencies' jurisdictions to only those functions explicitly allocated to them under the Act. On the contrary, the Act specifically instructs the Director of USCIS to "establish the policies for performing such functions as are transferred to the Director" under the Act "*or otherwise vested in the Director by law*." 6 U.S.C. § 271(a)(3)(A) (emphasis added). This language confirms that the Homeland Security Act is not the exclusive source of USCIS's authority.

Another source of authority is 8 U.S.C. § 1154, which provides directions on how to treat several special categories of visa applicants. One such category is persons seeking

11

to be classified as immediate relatives of U.S. citizens via a Form I-130 petition. Those petitions are adjudicated by USCIS, and the statute instructs the adjudicator to conduct "an investigation of the facts in each case" before approving or denying a request to recognize a noncitizen as an immediate relative. 8 U.S.C. § 1154(b). The statute also expressly prohibits the approval of petitions on behalf of noncitizen beneficiaries who have previously sought immediate relative status "by reason of a marriage determined by the [Secretary of Homeland Security] to have been entered into for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c)(1).

Of course, Congress did not expect the Secretary himself to personally make each individual determination. To that end, Congress gave the Secretary the power to "require or authorize any employee of the Service . . . to perform or exercise any of the powers, privileges, or duties conferred" on him or other members of the Service. 8 U.S.C. § 1103(a)(4). The term "Service" here once referred to the old INS, but after the 2002 reorganization Congress instructed that it "shall be deemed to refer to . . . the component of the Department [of Homeland Security] to which such function [was] transferred." 6 U.S.C. § 557. The adjudication of I-130 petitions authorized under § 1154 was transferred to USCIS, and so the Secretary has the clear authority to delegate to USCIS his obligation to determine whether a marriage was fraudulent for purposes of those petitions.

The Secretary made just such a delegation by issuing 8 C.F.R. § 103.2(b)(7), which authorizes USCIS to take testimony and "direct any necessary investigation" when adjudicating benefit requests, such as the requests for immediate relative status at issue in this case. In addition to that general delegation, the Secretary has specifically authorized

12

USCIS to "investigate . . . alleged fraud with respect to applications." Delegation No. 0150.1(I).

In response to these delegations of authority, USCIS has created an entire 650-officer-strong department—the FDNS—whose mission is to "detect, deter, and administratively investigate immigration-related fraud." U.S. Citizen and Immigration Services, *Fraud Detection and National Security Directorate: Mission Essential Functions* (May 2002). That task includes "conduct[ing] site visits and administrative investigations unilaterally or jointly with law enforcement agencies." *Id.* Were we to agree with the Mestaneks, we would not merely be undoing the work of an isolated USCIS officer. Rather, we would be holding that much of the labor undertaken by the FDNS is ultra vires and undermining its investigatory work in countless marriage-fraud determinations. Given that the statutory regime described above provides ample support for the agency's current practice, we decline to take such a disruptive stance.

In allocating USCIS a set of nonexhaustive functions, Congress did not intend to hamstring USCIS's ability to fulfill the statutory mandate to investigate cases before adjudicating them. We therefore reject the Mestaneks' challenge to USCIS's investigations in their case and decline to strike the results of those investigations, including Angel's 2017 confession.

## B.

The Mestaneks next assert that USCIS provided the district court with an incomplete administrative record that was insufficient for judicial review. They assert that the certified administrative record is missing three things: a memo referenced in the attachment list of

13

the FDNS investigation results, the notes taken by FDNS investigators during Angel's confession, and an "ICE declination" document giving a reason for why ICE did not take up the case.

We have long recognized that public officials enjoy a "presumption of regularity" in the performance of their official duties. *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1368 (4th Cir. 1975); *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996). And so when an agency certifies that the administrative record it has provided to the court is complete, courts generally presume it to be so absent clear evidence to the contrary. *See Outdoor Amuse. Bus. Assn., Inc. v. DHS*, 2017 WL 3189446, at *12 (D. Md. July 27, 2017) (collecting cases).

There is no such evidence here. As for the memo, the district court correctly identified that it is in fact included in the record at J.A. 1099–1100. *See Mestanek*, 2022 WL 17841270, at *4. As for the other two "missing" documents, it is not even clear that they exist. Nothing in the record refers to any notes taken by the FDNS investigators or even suggests that notes were taken, and the Mestaneks' speculation alone will not suffice. The ICE declination document's existence is even more speculative. USCIS never referred the case to ICE, *see* J.A. 1092, so it is unsurprising that there is no document to memorialize ICE declining a case it never received.

For these reasons, we find that the certified administrative record provided by USCIS is complete for purposes of judicial review.

C.

14

The Mestaneks then argue that USCIS's denial of Mary's petition was arbitrary and capricious because it applied the wrong legal standard for marriage fraud. In support, they point to USCIS's failure to cite *Matter of Singh*, 27 I. & N. Dec. 598 (BIA 2019), a recent Board of Immigration Appeals decision that clarified the standard of proof that governs the application of the marriage-fraud bar.

We will not presume that the agency misapplied its own standard unless there is good reason to suspect it did so. Here, all evidence points the other way.

To begin with, *Matter of Singh* did not change the standard. It was merely a recent clarification of the Board's preexisting standard for applying the marriage-fraud bar. USCIS regulations establish that a noncitizen is subject to the marriage-fraud bar whenever there is "substantial and probative evidence" that "he attempted or conspired to enter into a marriage for the purposes of evading the immigration laws." 8 C.F.R. § 204.2(a)(1)(ii). In *Matter of Singh*, the Board explained that to qualify as "substantial and probative," "evidence must establish that it is more than probably true that the marriage is fraudulent." 27 I. & N. Dec. at 607. But in doing so, the Board noted that this interpretation was "consistent with the standard [it] currently employ[ed] in adjudicating visa petitions involving marriage fraud." *Id.* Thus, USCIS's failure to reference *Matter of Singh* was neither here nor there.

Indeed, the USCIS decision denying Mary's Form I-130 petition referenced the appropriate "substantial and probative evidence" standard twice. *See* J.A. 792. And it cited the Board of Immigration Appeals' decision in *Matter of Tawfik*, 20 I. & N. Dec. 166 (BIA

15

1990), which *Matter of Singh* heavily relied on in articulating the standard applied therein. *See Matter of Singh*, 27 I. & N. Dec. at 602–03.

Moreover, *Matter of Singh* does not assist the Mestaneks' case. In that case, the Board relied on evidence that clearly resembled the evidence USCIS relied on in denying the Form I-130 petition here. In *Matter of Singh*, the noncitizen's spouse had admitted to FDNS agents that the marriage was fraudulent but later submitted an affidavit denying that she had made such an admission. *Id.* at 600. The Board was not swayed. It held that an affidavit-based recantation alone "will generally not be sufficient to overcome evidence of marriage fraud," especially when "other evidence in the record supports the reliability of the admissions." *Id.* at 609–10.

Just so here. Angel's admission coheres with the other evidence much more neatly than her recantation. The sham marriage to which she confessed explains the discrepancies between her and Robert's interview answers and the evidence that they were not cohabiting. In short, the record evidence amply supports USCIS's determination that Angel's confession was more reliable than her recantation, which in turn makes it "more than probably true" that the marriage was fraudulent. *Id.* at 607. Like the district court, we have "no difficulty in finding that the evidence cited by the agency clearly satisfies" the "substantial and probative evidence" standard as clarified in *Matter of Singh*. *See Mestanek*, 2022 WL 17841270, at *5.

D.

The Mestaneks next claim that USCIS violated its own regulations when it refused to allow them to inspect the record of proceedings. USCIS's general rule is that "[a]n

16

applicant or petitioner shall be permitted to inspect the record of proceeding which constitutes the basis for the decision." 8 C.F.R. § 103.2(b)(16). But the regulation codifying that rule lists four exceptions, one of which is for "derogatory information unknown to [the] petitioner or applicant." 8 C.F.R. § 103.2(b)(16)(i). That exception stipulates that:

> If the decision will be adverse to the applicant or petitioner and is based on derogatory information considered by [USCIS] and of which the applicant or petitioner is unaware, he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered.

8 C.F.R. § 103.2(b)(16)(i).

USCIS's denial of Mary's Form I-130 petition clearly qualifies for the exception. It was a decision adverse to the Mestaneks based on information that they were unaware of—namely, Angel's January 2017 confession. USCIS thus complied with its regulation when it advised the Mestaneks of the confession and provided them with enough information about the confession to allow them a chance for rebuttal.

The Mestaneks urge that the unknown-derogatory-information exception is not an exception at all, but rather a separate notice requirement. But the regulation's text and structure undermine this contention. The regulation provides the general rule that applicants and petitioners are entitled to inspect the record of proceedings "except as provided in the following paragraphs." 8 C.F.R. § 103.2(b)(16). The provision that covers unknown derogatory information comes directly after that phrase. *Id.* Thus, the regulation specifically "except[s]" unknown derogatory information from the general rule of access. Indeed, other courts that have considered the question have agreed with this reading. *See, e.g., Mangwiro v. Johnson*, 554 Fed. App'x 255, 261–62 (5th Cir. 2014) (per curiam). The

17

exception for unknown derogatory information also makes good sense in that it will sometimes be necessary to protect the privacy and safety of the third-party sources who provided the adverse statements.

We thus agree with the district court that, in a case of an adverse decision based on information unknown to the petitioner, USCIS's regulations require only that the petitioner be notified of the information and given a chance to rebut it. USCIS thus fulfilled its obligations when it advised the Mestaneks of Angel's confession, provided them with a summary of its contents, and allowed them to rebut the allegations therein.

E.

The Mestaneks next turn to contesting the way that USCIS weighed the evidence before it.

First, they contend that USCIS ignored key documents that evinced a true marital relationship between Robert and Angel, including joint tax records, shared leases and bills, phone records, photos of the couple together, and letters of support. But we decline to impose on the agency a requirement to discuss every piece of evidence it receives, *see Fosso v. Sessions*, 692 Fed. App'x 744, 754 (4th Cir. 2017), especially when it is clear from the decision that USCIS did address the rebuttal evidence submitted by Mary.

Moreover, the Mestaneks' view fails to overcome the evidence in favor of the marriage-fraud bar. 8 U.S.C. § 1154(c). The Mestaneks insist, however, that USCIS failed to give Angel's 2020 retraction of her confession the weight it deserved. But it is not our role to reweigh the evidence and "substitute [our] judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), when it is clear,

18

as here, that the agency had a sound basis for its decision. *See Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012). It was hardly irrational for USCIS to conclude that Angel's retraction, signed in the office of Robert's attorney, was not credible given the other evidence in the record, which (as recounted at length above) corroborated not the retraction but the confession. *See Matter of Singh*, 27 I. & N. Dec. at 609–10.

In short, we find that USCIS had a rational basis for weighing the evidence as it did and finding that Robert was subject to the marriage-fraud bar. 8 U.S.C. § 1154(c).*

F.

Finally, the Mestaneks assert a procedural due process violation based on their allegations that USCIS failed to apply the proper standard of proof and failed to provide copies of the derogatory evidence. But we have already determined that USCIS applied the proper standard in making its marriage-fraud determination and that USCIS met its burden to provide the Mestaneks with derogatory evidence in accordance with its regulations. *See supra* Sections II.C–D.

Moreover, the Mestaneks were afforded plenty of process. Due process requires only "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). USCIS provided the Mestaneks with a notice of intent to deny that described in detail the derogatory evidence against them. That

---

* The Mestaneks also argue that USCIS's other rationale for denying their petition—that Robert's Florida divorce was not valid—was in error because it misapplied Florida law. Having found that the marriage-fraud bar applies, we have no need to address that state-law question and instead uphold USCIS's denial on the basis of the marriage-fraud bar alone.

description included a thorough review of Angel's confession as well as an account of the evidence that Angel and Robert were not cohabiting during their marriage. *See* J.A. 833. The Mestaneks had a chance to respond and submit rebuttal evidence. USCIS then issued, as noted, a careful decision considering that rebuttal evidence and explaining why it did not refute the agency's initial findings. In the case of a Form I-130 petition, that is certainly enough process to pass constitutional muster. *See Gebhardt v. Nielsen*, 879 F.3d 980, 988 (9th Cir. 2018); *Bremer v. Johnson*, 834 F.3d 925, 932–33 (8th Cir. 2016); *see also Kerry v. Din*, 576 U.S. 86, 102–04 (2015) (Kennedy, J., concurring in the judgment). We therefore conclude that the Mestaneks have failed to establish a due process violation on the part of USCIS.

### III.

In sum, adopting the Mestaneks' position in this case would upend Congress's instruction that prior marriage fraud should bar the granting of Form I-130 petitions. It would also overturn the agency's thoughtful application here of the relevant statutory and regulatory provisions. The respect of federal courts is owing to both. For the foregoing reasons, the judgment of the district court is hereby

*AFFIRMED.*

20